IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:

IDLEAIRE TECHNOLOGIES
CORPORATION,
Debtor.

Chapter 11
Case No. _____ (___)

## DECLARATION OF MICHAEL C. CRABTREE IN SUPPORT OF FIRST DAY MOTIONS AND APPLICATIONS

I, Michael C. Crabtree, hereby declare under penalty of perjury:

1. I am Chief Executive Officer of IdleAire Technologies Corporation ("IdleAire"), a corporation organized under the laws of Delaware and the above-captioned debtor and debtor-in-possession. I am familiar with Debtor's day-to-day operations, business, and financial affairs.

2. On or about May 12, 2008 (the "Petition Date"), the Debtor filed a voluntary petition pursuant to Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") commencing the above captioned case. The Debtor continues to operate its business and manage its properties and assets as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3. No trustee or examiner has been appointed in the Debtor's chapter 11 case, and no committees have been appointed or designated.

4. In order to enable the Debtor to operate effectively and minimize certain of the potential adverse effects of the commencement of this chapter 11 case on its business operations, the Debtor has requested various types of relief in certain "first day" motions and applications (each, a "First Day Pleading" and collectively, the "First Day Pleadings"). The First Day Pleadings,

described in detail below, seek, among other things, to ensure the continuation of the Debtor's cash management system and business operations without interruption, preserve vendor and customer relationships, maintain employee morale and confidence, and establish certain other administrative procedures designed to ease the Debtor's transition into bankruptcy.

5.  I submit this declaration (the "Declaration") in support of the First Day Pleadings. Any capitalized terms not expressly defined herein have the meanings set forth in the relevant First Day Pleading. I am familiar with the contents of each First Day Pleading, and I believe that the relief sought in each First Day Pleading (i) is necessary to enable the Debtor to operate in chapter 11 with minimum disruption or loss of productivity or value, (ii) constitutes a critical element in achieving a successful reorganization of Debtor, and (iii) is in the best interests of the Debtor, its estate and creditors.

6.  Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, on information supplied to me by other members of the Debtor's management team and/or professionals retained by the Debtor, on information learned from my review of relevant documents, or on my opinion based upon my experience and knowledge of the Debtor's operations, financial condition and present liquidity needs. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of the Debtor.

### IdleAire's Business and Operations

7.  IdleAire designs, installs and operates systems that provide heating, air conditioning, electrical power, entertainment and communications services to the cabs of long-haul truckers so that drivers can eliminate idling of the truck engine while they are stopped to

rest during United States Department of Transportation ("DOT") promulgated regulation required and other rest periods (the "ATE system").

8. The IdleAire systems consist of supported steel trusses under which tractor-trailers park, with 12 inch diameter flexible hoses running from the trusses. The hoses are attached to specially designed inserts placed in a truck cab's window opening. When the trucker parks below one of the trusses in an equipped parking space, inserts a service module into a specially designed window adapter and opens the module at the end of the hose, he or she has available heating, air conditioning, high speed internet, satellite television, movies on demand, telephone service, training videos and electrical outlets, all of which run from an in-ground source, through the trusses and the hoses to the cab.

9. Revenues are generated through payment by drivers or by a driver's fleet owner for the IdleAire services based upon a per minute (per hour for the first hour) charge for the use of our basic services and based upon per visit charges for premium services. The service module has a card reader device through which drivers can run most major credit cards, fuel cards issued to fleet drivers by their employers, or IdleAire Cards, which are pre-paid debit cards available for purchase and that can be re-loaded as needed at IdleAire locations. The retail charge for basic services at present is approximately $2.18 per hour, with additional charges for such premium services as movies on demand, premium television packages, Ethernet, wireless internet and long distance telephone service.

10. The value proposition presented by IdleAire to its customers is fourfold. First, it allows truckers the comfort and quiet of heat or cooling while they take the ten hours of rest required by DOT regulation after every eleven hours of driving time without having to keep their engines idling. Second, because no idling is required, the costs of idling, which include roughly

3

one gallon of currently four dollars per gallon diesel fuel per hour of idling and engine wear and tear, are replaced by a per hour charge that is currently approximately half that of idling-related fuel costs. Third, using the ATE system, with the attendant ability to shut down the fuel-burning engine, enables the truckers to comply with the anti-idling statutes enacted in thirty-two states nationwide, although admittedly unevenly enforced. Finally, use of IdleAire's systems eliminates the emission of greenhouse gasses that would otherwise be released from the idling engines of long-haul trucks.

11. IdleAire employs approximately 1,200 people. Approximately eighty percent (80%) of those employees are located at the 129 truck stops and two fleet terminals throughout 34 states at which IdleAire has installed its equipment to service a total of approximately 8,493 parking spaces. The balance of the employees is located at five leased locations in and around Knoxville, Tennessee. The employees in the Knoxville locations are primarily engaged in information technology and customer support; construction, configuration and procurement; engineering and research and development; finance and audit; and marketing and sales.

12. IdleAire occupies the truck stops at which it conducts business pursuant to the terms of leases or licenses with the owners of those truck stops. Of the 131 locations at which IdleAire operates, 108 are occupied pursuant to the terms of a master lease agreement with TA Operating Corporation ("TA"), which does business under the trade name of Travel Centers of America. The master lease, and the addendum thereto, in essence requires that IdleAire pay as rent to TA a certain percentage of revenues generated by operation of the ATE system at IdleAire's TA sites.

## Capital Structure, Financial Performance, Liabilities and Assets

13. IdleAire is a publicly reporting Delaware corporation.

14. Formed in 2000, IdleAire's early research, development and initial implementation was largely funded through private equity placements with qualified investors who invested approximately $114 million in IdleAire. As a result, its equity, although not publicly traded, is held by over 3,000 shareholders, including 1,141 holders of common stock and approximately 1,918 holders of interests in the three series of preferred stock that has been issued.

15. IdleAire is not yet a mature company. Since its formation, its activities have concentrated first on research and development and then on identification of sites and installation of systems. As at year-end 2005, 2006 and 2007, IdleAire had 24, 99 and 130 sites respectively. It has not yet been profitable, realizing a net loss of $93.4 million on total net revenues of $37.2 million in 2007, and a loss of $60 million on $14 million in total net revenues in 2006. It has an accumulated deficit through December 31, 2007 of $246.4 million. Its business plan has long-centered around reaching profitability through site expansion in order to achieve a sufficient network to increase market recognition and attractiveness to fleet owners in order to improve the average utilization of its systems above the 25% level currently realized.

16. The $1 million per site cost of installing what on average are 65 spaces per location, was initially funded in part through the equity money raised. Those initial installation costs were also in part funded through government grants issued by the Federal, as well as several state, governmental agencies seeking to encourage the installation and use of greenhouse gas reduction and fuel-saving technologies. IdleAire has been awarded $55.6 million in such grants, of which it had collected through December 31, 2007 approximately $25.1 million.

17. In order to meet the substantial capital requirements of implementing its business plan of installing a nationwide network of sites centered around domestic interstate highways, IdleAire sought additional funding through the issuance of publicly traded notes (the "Note Funding"). In connection with the Note Funding, IdleAire issued, in December, 2005, 13% senior discount notes with detachable warrants (the "Notes"), raising $234.8 million through sale of $320 million in notes. Net proceeds realized by IdleAire after fees, expenses and debt repayment were $207.6 million. The Notes provided for interest to be paid in kind through June, 2008, with the first cash payment of approximately $20.8 million towards interest coming due in December, 2008. The Notes mature on December 15, 2012.

18. IdleAire's obligations under the Notes were senior claims and were secured by a lien on essentially all of its assets. The liens granted in connection with the Prepetition Note Funding were perfected through filing appropriate financing statements with the Delaware Secretary of State and, as to the Debtor's patents and service marks, assignments with the United States Patent and Trademark Office.

19. That lien was, as of the closing of the Prepetition Note Funding, senior to all other liens. The indenture executed in connection with the Prepetition Note Funding, under which Wells Fargo N.A. serves as both indenture trustee and collateral agent, expressly provided for both the claims under the Notes, and the security granted for IdleAire's obligations under the Notes, to be subordinated to later-acquired working capital funding of up to $25 million.

20. IdleAire sought to raise further funding to carry out the network expansion involving further site installations through an initial public offering. It filed a Form S-1 with the Securities and Exchange Commission in September, 2007. Market uncertainties, however, led to

6

underwriter-requested postponements, and eventually to the withdrawal of underwriter support in March, 2008.

21. Faced with an unanticipated liquidity shortfall spurred by the market uncertainties and the withdrawal of underwriter support for an initial public offering, IdleAire sought to locate alternative sources of funding. It engaged in a series of discussions with existing equity holders, as well as with a variety of financial institutions and other sources of debt-based financing. In March, 2008, it engaged KPMG Corporate Finance, LLC ("KPMG") for the purpose of locating potential additional sources of funding. It also engaged in discussions with the holders of the Notes (the "Prepetition Note Holders"), who formed an ad hoc committee (the "Ad Hoc Committee") that I am informed was comprised of institutions holding in excess of sixty percent (60%) of the outstanding amount of the Notes.

22. Agreement was reached with certain of the Prepetition Note Holders as to a short-term bridge loan to address then-imminent liquidity concerns. A closing on that financing, pursuant to which Wells Fargo acts as administrative agent and collateral agent, occurred on April 24, 2008 and funding occurred on April 25, 2008 (the "Prepetition Bridge Loan"). The Credit Agreement relating to the Prepetition Bridge Loan provides that IdleAire may borrow up to $25 million. All loans under the facility bear interest at 12% per annum, payable in kind monthly in arrears (with a cash pay option). The facility matures at the earliest of (i) May 2, 2008, (ii) the date that the commitments under the Credit Facility are terminated upon an event of default, (iii) the first date that the Company determines to proceed with the sale or liquidation of the Company other than pursuant to a transaction agreed to by the Lenders in their sole discretion, or (iv) the commencement by the Company of a case under Chapter 11 of the

Bankruptcy Code. The credit agreement relating to the Bridge Loan expressly envisions further funding in the form of the debtor-in-possession financing for which approval is currently sought.

23. In accordance with the Prepetition Note Funding indenture provisions for the subordination of the claims and liens of the holders of those Notes to a working capital credit facility of up to $25 million, IdleAire's obligations in connection with the Prepetition Bridge Loan are secured by a first priority lien on essentially all of its assets. Those liens were perfected through appropriate filings with the Delaware Secretary of State and the United States Patent and Trademark Office. As of the Petition Date, approximately $3.7 million had been advanced under the Prepetition Bridge Loan.

24. Additional liabilities of IdleAire as of the Petition Date include obligations evidenced by junior secured convertible notes (the "Junior Notes") totaling $100,000 due to Dan Fenton, III as administrative agent for certain insiders and equity holders (the "Junior Funding"). The documents evidencing the Junior Funding purport to provide that IdleAire's obligations under the Junior Notes were to be secured by a lien on essentially all assets of IdleAire. The liens granted in connection with the Junior Funding, however, were not perfected.

25. The remaining claims against IdleAire consist primarily of employee wage and benefit obligations that accrue at a rate of approximately $2 million per two week period and are paid three weeks in arrears as well as accrued vacation pay of approximately $1.1 million, trade payables of approximately $2.1 million held by approximately 200 claimants, lease obligations and approximately five unliquidated claims asserted by plaintiffs in litigation.

26. Assets as of December 31, 2007 were listed as having a book value of approximately $210 million, consisting largely of cash, deposits, property and equipment and

8

intellectual property. Of the $210 million total book value, $153 million is comprised of property and equipment—primarily the trusses and systems located at the truck stops.

## Events Leading to the Chapter 11 Case

27. Facing a severe liquidity shortfall, IdleAire continued to seek financing from a number of sources and in forms ranging from equity investment through an initial public offering or cash infusion from existing equity holders, direct discussions with various funding sources and an investment banker-lead solicitation of known debt-based non-risk adverse investors.

28. Most recently, in March, 2008, IdleAire engaged KPMG to solicit proposals for financing. KPMG prepared a private placement memorandum seeking unsecured, secured, debtor-in-possession on either an unsecured administrative priority or other basis or other form of investment. It contacted 11 known debt-based investors in distressed companies. Three such investors executed non-disclosure agreements and undertook due diligence. Two of those entities undertook substantial negotiations as to terms. Neither those two entities, nor any other entity, offered any form of financing.

29. Given its inability to raise operating capital, IdleAire's management has determined in its reasonable business judgment that it is in the best interests of all stakeholders to commence a Chapter 11 case.

## Summary of First Day Pleadings

a. **Motion of the Debtor (a) for Authorization to (i) Obtain Post-Petition Financing Pursuant to 11 U.S.C. § 364; (ii) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (iii) Grant Priming Liens and Superpriority Claims to Dip Secured Parties Pursuant to 11 U.S.C. § 364(c) and (d); (iv) Provide Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364; and (v) Schedule a Final Hearing Pursuant to Bankruptcy Rule 4001**

30.   By this Motion (the "DIP Financing Motion"), the Debtor seeks entry of interim and final orders authorizing it to, among other things, (i) obtain post-petition financing pursuant to sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), and 507 of the Bankruptcy Code on an interim basis in an amount up to $8 million and on a final basis in the aggregate committed amount of up to $25 million (the "DIP Facility"); (ii) use cash collateral pursuant to section 363 of the Bankruptcy Code; and (iii) grant adequate protection pursuant to sections 361, 362, 363, 364, and 507 of the Bankruptcy Code to Wells Fargo, as agent for the Debtor's prepetition lenders, and the prepetition lenders. Pending a final hearing on this request, the financing will be implemented on an interim basis pursuant to a debtor-in-possession loan and security agreement.

31.   As noted above, subsequent to September 2007, the Debtor, faced with an unanticipated liquidity shortfall and the withdrawal of underwriter support for an initial public offering, sought to locate alternative sources of funding. An agreement was reached with certain Note holders as to a short-term bridge loan to address then-imminent liquidity concerns. A closing on that financing occurred on April 24, 2008 and funding occurred on April 25, 2008. The Credit Agreement relating to the Bridge Loan provides that IdleAire may borrow up to $25 million. All loans under the facility bear interest at 12% per annum, payable in kind monthly in arrears (with a cash pay option). The facility matures at the earliest of (i) May 2, 2008, (ii) the date that the commitments under the Credit Facility are terminated upon an event of default, (iii) the first date that the Company determines to proceed with the sale or liquidation of IdleAire other than pursuant to a transaction agreed to by the Lenders in their sole discretion, or (iv) the commencement by IdleAire of a case under Chapter 11 of the Bankruptcy Code. The credit

10

agreement relating to the Bridge Loan expressly envisions further funding in the form of the debtor-in-possession financing for which approval is currently sought.

32. The proposed financing, will be provided by certain of the lenders who funded the Bridge Loan. Wells Fargo will again act as administrative and collateral agent. The DIP Financing will satisfy the Bridge Loan, and will be senior to all obligations, including, but not limited to, the Bond Funding.

33. The Debtor has insufficient cash to meet its ongoing obligations necessary to allow it to operate its business while it implements its financial and operational restructuring. Specifically, without additional financing, the Debtor cannot maintain its business operations, nor can the Debtor pay the wages, salaries, rent, utilities and other expenses associated with operating its business.

34. Given Debtor's current lack of liquidity and the extensive prepetition yet ultimately unsuccessful efforts to obtain alternative financing, it is essential that the Court approve the DIP Loan Agreement as soon as possible.

   b. **Motion of the Debtor Pursuant to Sections 105(a), 363(c), and 345(b) of the Bankruptcy Code for Order (I) Authorizing the Debtor to (A) Continue Existing Cash Management System and (B) Maintain Existing Bank Accounts and Business Forms and (II) Granting Waiver of the Requirements of Section 345(b) of the Bankruptcy Code**

35. The Debtor requests that the Court enter an interim order (A) authorizing the Debtor to (i) continue to operate its centralized cash management system (the "Cash Management System"); (ii) fund its operations; and (iii) maintain the Debtor's existing bank accounts (the "Bank Accounts") and business forms and (B) waiving the requirements of section 345(b) of the Bankruptcy Code.

36. In the ordinary course of business, the Debtor uses the Cash Management System to efficiently collect, transfer, and disburse funds generated by its business operations. Any disruption of the Debtor's Cash Management System, including the closure of its Bank Accounts, would be detrimental to the Debtor's operations. Because the Debtor conducts business through 130 locations around the United States that generate money from customer sales, it would be extremely difficult and expensive to establish and maintain a different cash management system.

37. Also, if the Debtor was required to comply with the Office of the United States Trustee's "Operating Guidelines and Financial Reporting Requirements Required in All Cases Under Chapter 11," its operations would be severely harmed by the disruption, confusion, delay, and cost that would most certainly result from the closure of its existing bank accounts, the opening of new accounts, and the immediate printing of new checks with a "Debtor in Possession" designation on them. Because the Debtor believes that investment of the funds, if any, in a concentration account managed by SunTrust will provide the protection contemplated by section 345(b) of the Bankruptcy Code, the Debtor seeks a waiver of the "corporate surety" requirement.

38. The relief requested in this motion is vital to ensuring the Debtor's seamless transition into bankruptcy. Authorizing the Debtor to maintain its Cash Management System will avoid many of the possible disruptions and distractions that could divert the Debtor's attention from more pressing matters during the initial days of the chapter 11 case.

39. I believe that the relief requested in the cash management motion is in the best interests of the Debtor's estate and creditors and is both necessary and appropriate to the efficient administration of this case and the Debtor's reorganization efforts.

c. **Motion of Debtor Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order (I) Authorizing Payment of Wages, Compensation, and Employee Benefits and (II) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations**

40. The Debtor requests, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, that the Court authorize the Debtor to (a) honor and pay, in its sole discretion, (i) obligations relating to wages, salary, and compensation for its employees (ii) monthly and/or quarterly commissions to sales staff, (iii) payroll taxes owed to various taxing authorities, (iv) certain expense reimbursements, and (v) amounts under various benefit plans and policies for its employees, and all costs incident to the foregoing, and (b) maintain and continue to honor its practices, programs, and policies for its employees as they were in effect as of the Petition Date, and as such may be modified, amended, or supplemented from time to time in the ordinary course.

41. As of April 30, 2008, the Debtor employed approximately 1,200 people. The continued operation of the Debtor's business and its successful reorganization depends largely upon the retention of the services of these employees and the maintenance of employee morale and cooperation. Consequently, it is critical that the Debtor be authorized to satisfy its employee-related obligations and continue its ordinary course employee plans, policies, and programs in effect as of the Petition Date.

42. Moreover, if the checks issued and fund transfers requested in payment of the prepetition employee obligations are dishonored, or if such earned obligations are not timely paid post-petition, the Debtor's employees could suffer extreme personal hardship and may even be unable, in some instances, to pay their daily living expenses. In addition, it would be inequitable to require the Debtor's employees to bear personally the cost of any business

13

expenses they incurred prepetition for the benefit of the Debtor with the understanding that they would be reimbursed.

43. I believe that the authority to pay all employee obligations in accordance with the Debtor's prepetition business practices is in the best interests of the Debtor and its estate and will enable the Debtor to continue to operate its business in chapter 11 without disruption.

### d. Motion of Debtor Pursuant to Sections 105(a) and 366 of the Bankruptcy Code for Order (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment

44. The Debtor seeks entry of an interim order, pursuant to sections 105(a) and 366 of the Bankruptcy Code: (i) determining that the Debtor's utility companies have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code pending the entry of a final order; (ii) approving the Debtor's proposed offer of adequate assurance and procedures governing any additional or different requests for adequate assurance by the utilities companies; (iii) prohibiting the utility companies from altering, refusing, or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtor's proposed adequate assurance pending entry of a final order; (iv) determining the Debtor is not required to provide any additional adequate assurance beyond what is proposed by its motion pending entry of a final order; and (v) scheduling a final hearing on the motion to consider the relief requested.

45. Given that the Debtor operates one-hundred and thirty-one (131) sites and over eighty-five (85) separate utility providers, uninterrupted utility services are essential to the Debtor's ongoing operations and the success of the Debtor's reorganization. Should any utility company refuse or discontinue service, even for a brief period, the Debtor's business operations

14

could be severely disrupted, and such disruption would jeopardize the Debtor's reorganization efforts. It is essential that the utility services continue uninterrupted during the chapter 11 case.

46. I believe that the authority to pay the utility programs in accordance with the Debtor's prepetition business practices is in the best interests of the Debtor and its estate and will enable the Debtor to continue to operate its business in chapter 11 without disruption.

### e. Motion for Order Pursuant to Sections 105(a), 363(b), and 541 of the Bankruptcy Code for Authorization to Pay Prepetition Taxes and Fees

47. The Debtor seeks entry of an order, pursuant to sections 105(a), 363(b), and 541 of the Bankruptcy Code, authorizing it to pay all prepetition sales, use and franchise tax and local regulatory fees to various state and local taxing authorities, including those taxes and fees subsequently determined upon audit to be owed for periods prior to the Petition Date.

48. Payment of the prepetition taxes and fees is critical to the Debtor's continued, uninterrupted operations. Nonpayment of these obligations may cause taxing authorities to take precipitous action, including, but not limited to, filing liens, preventing the Debtor from conducting business in the applicable jurisdictions, seeking to lift the automatic stay, and imposing personable liability on the Debtor's officers and directors, all of which would disrupt the Debtor's day-to-day operations and could potentially impose significant costs on the Debtor's estate.

49. I believe that the authority to pay the taxing authorities in accordance with the Debtor's prepetition business practices is in the best interests of the Debtor and its estate and will enable the Debtor to continue to operate its business in chapter 11 without disruption.

### f. Motion of Debtor Pursuant to Sections 105(a), 363 (b), and 507 of the Bankruptcy Code for Authorization to Honor Prepetition Customer Obligations

50. The Debtor requests, pursuant to sections 105(a), 363(b), and 507(a)(7) of the Bankruptcy Code, authority to continue its prepetition customer obligations in the ordinary course of business. In the ordinary course of business, the Debtor's services are purchased by its customers using, among other things, a prepaid membership card purchased on-site at an ATM-like machine.

51. Because the membership cards are prepaid, membership cards that have been purchased or refilled prepetition may have credit balances remaining that have not as yet been drawn down by the customer as of the Petition Date. Absent the relief requested, customers would be unable to access such balances subsequent to the Petition Date. Further, given the need of the Debtor to not only maintain its customer base but increase the number of individual drivers utilizing its system, the Debtor believes it must quickly assure its customers that it will continue to honor the membership cards.

52. I believe that the authority to honor the Debtor's customer obligations in accordance with the Debtor's prepetition business practices is in the best interests of the Debtor and its estate and will enable the Debtor to continue to operate its business in chapter 11 without disruption.

### g. Motion of the Debtor for an Order Pursuant to 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals

53. The Debtor requests, pursuant to sections 105(a) and 331 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 2016(a), entry of an order establishing procedures for the compensation and reimbursement of attorneys and other professionals whose retentions are approved by this Court pursuant to section 327 or 1103 of the Bankruptcy Code on a monthly

16

basis, on terms that satisfy the requirements of Local Bankruptcy Rule 2016-2. Such an order will streamline the professional compensation process and enable the Court and all other parties to monitor more effectively the professional fees incurred in this chapter 11 case.

54. I believe that the authority to enter into the proposed interim compensation procedures for the Debtor's professionals is in the best interests of the Debtor and its estate and will enable the Debtor to continue to operate, and effectively reorganize, its business in chapter 11 without disruption.

### h. Motion for Order Pursuant to Sections 361 and 363(b) of the Bankruptcy Code and Bankruptcy Rule 4001(c) Authorizing Debtor to (I) Continue Honoring Prepetition Insurance Premium Financing Agreement and (II) Continue Grant of Security Interest Related Thereto

55. The Debtor requests, pursuant to sections 361 and 363(b) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(c), authority to continue performing under an insurance premium financing agreement with AICCO. The Debtor is financing premiums in connection with certain earthquake insurance (the "Policy") issued by Essex Insurance Company in the State of California.

56. The Policy is essential to the preservation of the Debtor's business, properties, and assets, particularly in light of the fact that ten (10) of the one-hundred and thirty sites operated by the Debtor are in California.

57. I believe that the authority to continue performing under the insurance premium financing agreement is in the best interests of the Debtor and its estate and will enable the Debtor to continue to operate, and effectively reorganize, its business in chapter 11 without disruption.

### i. Motion for Order Pursuant to Sections 105(a) And 363(b) of the Bankruptcy Code Authorizing the Debtor to Adopt and Implement an Incentive Plan for Certain Key Employees and Continue Existing Employee Severance Plan

58. The Debtor requests, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, entry of an order authorizing the Debtor to (i) implement an incentive plan for certain key employees and (ii) continue and maintain an existing prepetition severance plan for its employees.

59. The Debtor presently intends to sell all or substantially all of its assets pursuant to section 363 of the Bankruptcy Code. Pending any sale of the Debtor, the Debtor faces a difficult task in ensuring the retention of its employees. Without them, the Debtor would be unable to operate or maintain its sites or manage the back-office operations that support those sites. This could potentially have a significant adverse effect on the Debtor's ability to preserve its going concern value, thus reducing the price the Debtor could receive for its assets through competitive bidding.

60. Furthermore, certain principal employees, twenty-two (22) in total, require further incentives (in addition to regular salary) to successfully close the proposed sale of the Debtor's business. Given the hard work and commitment that these principal employees have displayed from the time of the decision to sell the assets through the approval of the sale procedures, the implementation of a performance-based management sale incentive program, conditioned upon the successful closing of the sale of the Debtor's business, will similarly ensure the same vital level of dedication by those principal employees through the closing of any sale.

61. I believe that the authority to implement an incentive plan for certain key employees and to continue and maintain the existing severance plan is in the best interests of the Debtor and its estate and will enable the Debtor to continue to operate, and effectively reorganize, its business in chapter 11 without disruption.

j. **Application of Debtor Pursuant to 28 U.S.C. § 156(c) and Local Rule 2002-1(f) for Authorization to (I) Employ and Retain Kurtzman, Carson Consultants, LLC as**

### Claims and Noticing Agent for the Debtor and (II) Appoint Kurtzman, Carson Consultants, LLC as Agent of the Bankruptcy Court

62. The Debtor requests, pursuant to 28 U.S.C. § 156(c) and Local Rule 2002-1(f), authorization to (i) employ and retain Kurtzman, Carson Consultants, LLC ("KCC") as claims and noticing agent for the Debtor.

63. I believe that the retention and appointment of KCC in connection with the administration of this chapter 11 case is in the best interests of the Debtor and its estate.

I declare under penalty of perjury that this Declaration is true and correct.

*Michael C. Crabtree*
Michael C. Crabtree
Chief Executive Officer
IdleAire Technologies Corporation

Dated: May 12, 2008

# 5323208_v2