# Exhibit A

**Asset Purchase Agreement**

ASSET PURCHASE AGREEMENT

by and between

**IDLEAIRE TECHNOLOGIES CORPORATION**

AS SELLER

and

**IDLEAIRE ACQUISITION COMPANY, INC.**

AS BUYER

Dated as of June 4, 2008

# TABLE OF CONTENTS

Page

**ARTICLE 1 PURCHASE AND SALE OF THE ACQUIRED ASSETS** .................................... 1

    1.1.   Transfer of Acquired Assets ........................................................................ 1
    1.2.   Excluded Assets ......................................................................................... 3
    1.3.   Assumption of Liabilities .......................................................................... 4
    1.4.   Excluded Liabilities ................................................................................... 5
    1.5.   Non-Assignment of Assigned Contracts .................................................... 6

**ARTICLE 2 CONSIDERATION** ................................................................................ 7

    2.1.   Consideration ............................................................................................. 7

**ARTICLE 3 CLOSING AND DELIVERIES** ............................................................... 7

    3.1.   Closing ....................................................................................................... 7
    3.2.   Seller's Deliveries ..................................................................................... 7
    3.3.   Buyer's Deliveries ..................................................................................... 8

**ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLER** ........................... 9

    4.1.   Corporate Organization .............................................................................. 9
    4.2.   Authorization and Validity ......................................................................... 9
    4.3.   No Conflict or Violation .......................................................................... 10
    4.4.   Consents and Approvals ........................................................................... 10
    4.5.   Compliance with Law .............................................................................. 10
    4.6.   Litigation ................................................................................................. 10
    4.7.   Material Contracts ................................................................................... 11
    4.8.   Permits .................................................................................................... 11
    4.9.   Environmental Matters ............................................................................ 11
    4.10.  Real Property .......................................................................................... 11
    4.11.  Employee Benefits .................................................................................. 11
    4.12.  Insurance ................................................................................................ 12
    4.13.  Utilities ................................................................................................... 12
    4.14.  Title to Assets. ........................................................................................ 12
    4.15.  Intellectual Property ............................................................................... 12
    4.16.  Brokers. .................................................................................................. 13

**ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER** ........................... 13

    5.1.   Corporate Organization ............................................................................ 13
    5.2.   Authorization and Validity ....................................................................... 13
    5.3.   No Conflict or Violation .......................................................................... 13
    5.4.   Consents, Approvals and Notifications ..................................................... 14
    5.5.   Adequate Assurances Regarding Assigned Contracts ............................... 14
    5.6.   Brokers. .................................................................................................. 14

**ARTICLE 6 COVENANTS OF SELLER** .................................................................. 14

    6.1.   Actions Before Closing ............................................................................ 14

| 6.2. | Maintenance of Assets Before the Closing Date | 14 |
|------|-----------------------------------------------|----|
| 6.3. | Consents and Approvals | 15 |
| 6.4. | Access to Properties and Records; Confidentiality | 15 |
| 6.5. | Rejection of Assigned Contracts | 16 |
| 6.6. | Further Assurances | 16 |
| 6.7. | Notices | 16 |
| 6.8. | Casualty Loss | 16 |

**ARTICLE 7 COVENANTS OF BUYER** ............................................................ 16

| 7.1. | Actions Before Closing Date | 16 |
|------|-----------------------------|----|
| 7.2. | Consents, Approvals and Notifications | 17 |
| 7.3. | Adequate Assurances Regarding Assigned Contracts | 17 |
| 7.4. | Cure of Defaults | 17 |
| 7.5. | Availability of Business Records | 17 |
| 7.6. | Employee and Benefits Matters | 18 |
| 7.7. | Notices | 18 |
| 7.8. | Amendment to List of Contracts | 18 |

**ARTICLE 8 BANKRUPTCY PROCEDURES** ................................................... 19

| 8.1. | Bankruptcy Actions | 19 |
|------|--------------------|----|
| 8.2. | Bidding Procedures | 19 |
| 8.3. | Sale Order | 19 |
| 8.4. | Consultation with Buyer | 19 |

**ARTICLE 9 REGULATORY MATTERS** ......................................................... 20

| 9.1. | Regulatory Filings | 20 |
|------|--------------------|----|
| 9.2. | Cooperation; Confidentiality Agreement | 20 |
| 9.3. | Objections or Other Challenges | 20 |
| 9.4. | Permit Transfers | 21 |

**ARTICLE 10 TAXES** ..................................................................................... 21

| 10.1. | Taxes Related to Purchase of Assets | 21 |
|-------|--------------------------------------|----|
| 10.2. | Proration of Real and Personal Property Taxes | 21 |
| 10.3. | Cooperation on Tax Matters | 22 |
| 10.4. | Retention of Tax Records | 22 |
| 10.5. | Allocation of Purchase Price and Purchase Price Allocation Forms | 22 |
| 10.6. | Unbilled Transactional Taxes | 23 |

**ARTICLE 11 CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES** .......... 23

| 11.1. | Conditions Precedent to Performance by Seller and Buyer | 23 |
|-------|----------------------------------------------------------|----|
| 11.2. | Conditions Precedent to Performance by Seller | 24 |
| 11.3. | Conditions Precedent to the Performance by Buyer | 25 |

**ARTICLE 12 TERMINATION AND EFFECT OF TERMINATION** ................. 26

| 12.1. | Right of Termination | 26 |
|-------|----------------------|----|
| 12.2. | Termination by Buyer or Seller | 26 |
| 12.3. | Effect of Failure of Seller's Conditions to Closing. | 28 |

|       | 12.4. | Effect of Failure of Buyer's Conditions to Closing. | 28 |
|       | 12.5. | Termination on Alternative Transaction | 28 |

**ARTICLE 13 MISCELLANEOUS** ........................................................................ 29

|       | 13.1.  | Successors and Assigns | 29 |
|       | 13.2.  | Governing Law; Jurisdiction | 29 |
|       | 13.3.  | Disclosure Schedule Supplements | 30 |
|       | 13.4.  | Survival of Representations and Warranties | 30 |
|       | 13.5.  | No Recourse Against Third Parties | 30 |
|       | 13.6.  | Mutual Drafting | 31 |
|       | 13.7.  | Severability | 31 |
|       | 13.8.  | Notices | 31 |
|       | 13.9.  | Amendments; Waivers | 32 |
|       | 13.10. | Public Announcements | 32 |
|       | 13.11. | Entire Agreement | 32 |
|       | 13.12. | Parties in Interest | 33 |
|       | 13.13. | Headings | 33 |
|       | 13.14. | Construction | 33 |
|       | 13.15. | Currency | 33 |
|       | 13.16. | Time of Essence | 33 |
|       | 13.17. | Counterparts | 33 |

**ARTICLE 14 DEFINITIONS** ................................................................................. 34

|       | 14.1. | Certain Terms Defined | 34 |
|       | 14.2. | All Terms Cross-Referenced | 39 |

## EXHIBITS

Exhibit A ............................................................................................................. Form of Bill of Sale
Exhibit B .......................................................... Form of Assignment and Assumption Agreement
Exhibit C ............................ Form of Non-Fee Property Assignment and Conveyance Agreement
Exhibit D .............................................................................. Form of Seller's Officer's Certificate
Exhibit E .......................................................................... Form of Non-Foreign Status Certificate
Exhibit F.................................................................................................... Bidding Procedures Order

## DISCLOSURE SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | Real Estate Leases |
| Schedule 1.1(c) | Entitled Real Property |
| Schedule 1.1(c) | Equipment |
| Schedule 1.1(d) | Assigned Contracts |
| Schedule 1.1(e) | Inventory |
| Schedule 1.1(f) | Intellectual Property |
| Schedule 1.1(g) | Permits |
| Schedule 1.2(f) | Excluded Assets |
| Schedule 1.3(g) | Assumed Liabilities |
| Schedule 4.4 | Governmental Consents and Approvals |
| Schedule 4.6 | Litigation |
| Schedule 4.7 | Material Contracts |
| Schedule 4.8 | License and Permit Exceptions |
| Schedule 4.9 | Environmental Matters |
| Schedule 4.11 | Employee Benefits Plans |
| Schedule 4.12 | Insurance Policies |
| Schedule 4.16 | Brokers |
| Schedule 7.4 | Cure Amounts |
| Schedule 11.1(b) | Antitrust and Regulatory Approvals |
| Schedule 11.2(e) | Released Persons |
| Schedule 14.1 | Permitted Liens |

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "*Agreement*"), dated as of June 4, 2008, is made by and between IdleAire Technologies, Inc., a Delaware corporation ("*Seller*"), and IdleAire Acquisition Company, Inc., a Delaware corporation (the "*Buyer*"). Capitalized terms used in this Agreement are defined or cross-referenced in Article 14.

### BACKGROUND INFORMATION

WHEREAS, on May 12, 2008 (the "*Petition Date*"), Seller filed a voluntary petition for relief under the Bankruptcy Code in the Bankruptcy Court (the "*Bankruptcy Case*");

WHEREAS, Seller is in the business of providing comprehensive in-cab idle-reduction services to the heavy-duty trucking industry (the "*Business*");

WHEREAS, as of May 13, 2008, Seller and the lenders from time to time party thereto (each, a "*Lender*", and, collectively, the "*Lenders*"), Wells Fargo Bank, National Association, as collateral agent for the Lenders and as administrative agent for the Lenders, entered into that certain Post-Petition Credit Agreement (the "*DIP Facility*"), pursuant to which, among other things, the Lenders agreed to loan to Seller an amount up to $25,000,000 solely to fund the Business between the Petition Date and the Closing;

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, the Acquired Assets, in a sale authorized by the Bankruptcy Court free and clear of all Liens, claims and other interests pursuant to, *inter alia*, sections 105, 363, and 365 of the Bankruptcy Code;

WHEREAS, it is intended that the acquisition of the Acquired Assets would be accomplished through the sale, transfer and assignment of the Acquired Assets by Seller to Buyer;

WHEREAS, Buyer also desires to assume, and Seller desires to assign and transfer to Buyer, the Assumed Liabilities;

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and undertakings herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer hereby agree as follows:

### ARTICLE 1
### PURCHASE AND SALE OF THE ACQUIRED ASSETS

1.1.    Transfer of Acquired Assets.    At the Closing, and upon the terms and conditions herein set forth, Seller shall sell to Buyer, and Buyer shall acquire from Seller, all of Seller's right, title and interest in, to and under the Acquired Assets free and clear of all Liens, claims and other interests (except for Permitted Liens and Assumed Liabilities) pursuant to

sections 105, 363 and 365 of the Bankruptcy Code. *"Acquired Assets"* shall mean solely the following property, but shall exclude the Excluded Assets:

(a) all of Seller's rights under any leases of real property (the *"Real Estate Leases"*), including, but not limited to, the Real Estate Leases listed on Schedule 1.1(a) of the Disclosure Schedules (the real property leased by Seller pursuant to the Real Estate Leases, the *"Leased Real Property"*);

(b) all of Seller's rights under the easements, rights of way, real property licenses, and other real property entitlements, including, but not limited to, the easements, rights of way, real property licenses and other real property entitlements listed on Schedule 1.1(b) of the Disclosure Schedules (the *"Entitled Real Property"*, and together with the Leased Real Property, the *"Real Property"*);

(c) all of (i) Seller's fixed assets, equipment, spare parts, machinery, furniture, fixtures, tools, computers, telephone systems, furniture, leasehold improvements and supplies, and other personal property wherever located or listed on Schedule 1.1(c) (the *"Equipment"*); and (ii) any rights of Seller, to the extent transferable, to the warranties and licenses received from manufacturers and sellers of the Equipment (if any);

(d) all of Seller's rights under the Contracts that are listed on Schedule 1.1(d) of the Disclosure Schedules (together with the Real Estate Leases, the *"Assigned Contracts"*);

(e) all (i) of Seller's raw materials, components and other parts, work-in-process, finished goods and all other inventory whether on hand, on order, in transit or held by others on a consignment basis or as listed on Schedule 1.1(e) (the *"Inventory"*) and (ii) any rights of Seller, to the extent transferable, to the warranties received from suppliers with respect to such Inventory;

(f) all intellectual property used in Seller's business, including all (A) copyright rights (registered and unregistered), software (including source code and object code), mask works, all of the foregoing whether domestic or foreign, registered, unregistered and/or common law (including, without limitation, all goodwill associated with any of the foregoing, licenses in respect of any of the foregoing and claims for infringement of or interference with any of the foregoing and the right to recover past damages); (B) all tradenames, tradename rights, trademarks, trademark applications, trademark rights, service marks, service mark rights, tradedress, domain names, URLs, web pages, in any case, whether domestic or foreign or registered, unregistered and/or common law, listed on Schedule 1.1(f) (including without limitation, all rights to the name "IdleAire" and all goodwill associated with any of the foregoing, licenses in respect of any of the foregoing, and claims for infringement of or interferences with any of the foregoing and the right to recover past damages); (C) patents and patent applications; (D) all confidential information, trade secrets, designs, specifications, know-how and other proprietary information and technology; and (E) all intellectual property set forth on Schedule 1.1(f) (the *"Intellectual Property"*);

(g) all permits, licenses, approvals, franchises, notices, registrations and authorizations issued by any Government necessary to operate the business (and pending applications for the foregoing) (collectively, "*Permits*") including, but not limited to, those Permits listed on Schedule 1.1(g) of the Disclosure Schedules, excluding only such Permits to the extent not legally transferable;

(h) copies, including copies in electronic form, of all Business Records;

(i) rights to and goodwill represented by the name IdleAire Technologies Corporation;

(j) all cash and cash equivalents, marketable securities, surety accounts, prepaid expenses, refunds (including, without limitation, all tax and insurance refunds), security and like deposits and other similar prepaid items relating to any Acquired Assets or Assumed Liabilities;

(k) all of Seller's accounts and notes receivable as of 11:59 p.m. (local time) on the Closing Date, if any (the "*Accounts Receivable*");

(l) any and all rights, demands, claims, credits, allowances, rebates, causes of action, known or unknown, pending or threatened (including all causes of action arising under sections 510, 544 through 551 and 553 of the Bankruptcy Code or under similar state Laws including fraudulent conveyance claims, and all other causes of action of a trustee and debtor-in-possession under the Bankruptcy Code) or rights of set-off (collectively, "*Claims*"), of Seller arising out of or relating to events prior to the Closing Date (except to the extent relating to the Excluded Liabilities), and not including Claims arising out of or relating in any way to the Bankruptcy Case or any of the transactions contemplated thereby or entered into as a consequence thereof including any claims (as defined in section 101(5) of the Bankruptcy Code) filed, scheduled or otherwise arising in the Bankruptcy Case;

(m) all rights, remedies and benefits of Seller arising under or relating to any of the Acquired Assets or the Assumed Liabilities, including without limitation, rights, remedies and benefits arising out of express or implied warranties from manufacturers or suppliers of the Inventory or Equipment (or components thereof), the other Acquired Assets or products purchased or ordered by Seller prior to the Closing Date (and in any case, any component thereof), and all claims and causes of action arising therefrom; and

(n) Seller's rights to any Emissions Credits that have been or that may be generated by the Acquired Assets.

1.2.     Excluded Assets. The Acquired Assets do not include the properties and assets listed or described in this Section 1.2 (all properties and assets not being acquired by Buyer are herein referred to as the "*Excluded Assets*"):

(a) all prepaid expenses, refunds (including, without limitation, all tax and insurance refunds), security and like deposits and other similar prepaid items, in each case relating to any Excluded Liabilities;

(b) all rights to Claims or adjustments with respect to Excluded Assets relating to any proceeding before any Government, all insurance policies and all rights to insurance proceeds or other insurance recoveries to the extent relating to Excluded Assets or Excluded Liabilities;

(c) all losses, loss carry forwards and rights to receive refunds, credits and loss carry forwards with respect to any and all Taxes of Seller incurred or accrued on or prior to the Closing Date, including interest receivable with respect thereto;

(d) all rights of Seller arising under this Agreement and under any other agreement between Seller and Buyer entered into in connection with this Agreement;

(e) all Retained Books and Records;

(f) any assets set forth on Schedule 1.2(f) of the Disclosure Schedules;

(g) all rights in Employee Benefits Plans except as may be otherwise agreed to by Buyer and Seller; and

(h) all rights under the Transaction Documents.

1.3.    Assumption of Liabilities.    Subject to the terms and conditions of this Agreement and on the basis of the representations, warranties, covenants and agreements herein contained, at the Closing, Buyer shall assume, and Buyer shall hereafter pay, perform and discharge when due, the liabilities and obligations of Seller as listed below (collectively, the "*Assumed Liabilities*"):

(a) all liabilities and obligations arising after the Petition Date with respect to accounts payable for trade payables, arising in the ordinary course of operation of the Business in connection with the Acquired Assets and in existence at 11:59 p.m. (local time) on the Closing Date (the "*Accounts Payable*");

(b) all liabilities and obligations under the Assigned Contracts arising after the Closing Date and the cure costs for such Assigned Contracts as set forth on Schedule 7.4;

(c) all liabilities and obligations of Seller under the Permits arising after the Closing Date;

(d) all liabilities and obligations for Taxes to the extent (but solely to the extent) provided for as a Buyer obligation in Article 10;

(e) all liabilities and obligations relating to or arising from the ownership of the Acquired Assets after the Closing Date;

(f) liabilities related to employees and former employees to the extent provided for in Section 7.6;

(g) all liabilities and obligations relating to prepaid membership cards issued by Seller; and

(h) all liabilities and obligations of Seller set forth on Schedule 1.3(h).

1.4.    Excluded Liabilities.    Except as specifically provided in Section 1.3 hereof, Buyer shall not assume nor be deemed to assume and shall have no responsibility or obligation with respect to, any liability or obligation of, or claim against, Seller, or of any predecessor, stockholder or other Affiliate of Seller, of any kind or nature, whether absolute, accrued, contingent or otherwise and whether due or to become due and whether or not asserted, and whether or not known or unknown or currently existing or hereafter arising, and however arising (collectively, the "*Excluded Liabilities*"). The Excluded Liabilities shall include, without limitation:

(a) all liabilities or obligations in respect of or relating to the Excluded Assets;

(b) liabilities related to employees and former employees except as provided in Section 7.6;

(c) all of Seller's professional fees and expenses for advisors, including without limitation, advisors retained pursuant to an order of the Bankruptcy Court;

(d) other than those liabilities assumed by Buyer pursuant to as Section 1.3(a), all of Seller's administrative expenses relating to the Bankruptcy Case;

(e) all employment and change in control agreements (or such similar agreements) and all stock option agreements and stock purchase agreements to which Seller is a party;

(f) all obligations and liabilities associated with any employee benefit plan of Seller that is not expressly acquired or assumed by Buyer;

(g) liabilities and obligations, whether known or unknown, relating to any environmental, health or safety matter (including, without limitation, any liability or obligation arising under Laws);

(h) trade payables and priority or non-priority unsecured claims not expressly assumed under this Agreement;

(i) all Claims against Seller arising under the Secured Notes;

(j) any liabilities of Seller which any Person seeks to impose upon the Buyer by virtue of any theory of successor liability, other than such claims and defenses as are contemplated by and preserved under Section 363(o) of the Bankruptcy Code;

(k) any liabilities with respect to any action, claim, suit, arbitration, inquiry, investigation or other proceeding of any nature (whether criminal, civil, legislative, administrative, regulatory, prosecutorial or otherwise) by or before any arbitrator or

Governmental Authority or similar Person or body (each, an *"Action"*) or other contingent liabilities of Seller, whether or not disclosed to the Buyer, relating to periods and occurrences ended on or before the Closing Date, including, without limitation, any Actions or other claims or contingent liabilities relating to tort, personal injury and products liability;

(l) obligations arising under each Contract that is not an Assigned Contract;

(m)all liabilities and obligations of Seller arising under or relating to any notice and other requirements of the Worker Adjustment and Retraining Notification Act of 1988 (the *"WARN Act"*);

(n) any obligation to provide and any claims made pursuant to any COBRA coverage and any related administrative costs;

(o) all liabilities and obligations of Seller arising under or relating to the DIP Facility; and

(p) any other liability or obligation not expressly assumed pursuant to Section 1.3.

1.5.     Non-Assignment of Assigned Contracts.  Anything contained herein to the contrary notwithstanding, (i) this Agreement shall not constitute an agreement to assign any Assigned Contract if, after giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without obtaining a Consent, would constitute a breach thereof or in any way negatively affect the rights of Seller or Buyer, as the assignee of such Assigned Contract and (ii) no breach of this Agreement shall have occurred by virtue of such nonassignment.  If, after giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, such Consent is required but not obtained, Seller shall, at Buyer's sole cost and expense, cooperate with Buyer in any reasonable arrangement, including Buyer's provision of credit support, designed to provide for Buyer the benefits and obligations of or under any such Assigned Contract, including enforcement for the benefit of Buyer of any and all rights of Seller against a third party thereto arising out of the breach or cancellation thereof by such third party; provided, that nothing in this Section 1.5 shall (x) require Seller to make any significant expenditure or incur any significant obligation on its own or on Buyer's behalf or (y) prohibit Seller from ceasing operations or winding up its affairs following the Closing.  Any assignment to Buyer of any Assigned Contract that shall, after giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, require the Consent of any third party for such assignment as aforesaid shall be made subject to such Consent being obtained.  Any contract that would be an Assigned Contract but is not assigned in accordance with the terms of this Section 1.5 shall not be considered an "Assigned Contract" for purposes hereof unless and until such contract is assigned to Buyer following the Closing Date upon receipt of the requisite consents to assignment and Bankruptcy Court approval.

## ARTICLE 2
## CONSIDERATION

2.1.    Consideration.  The aggregate consideration for the sale and transfer of the Acquired Assets shall be $10,000,000 (the *"Purchase Price"*), which price is payable and deliverable at the Closing in accordance with Section 3.3.  The Purchase Price shall be payable, at the Buyer's option, in the form of (i) the exercise of credit bid rights under Section 363(k) of the Bankruptcy Code with respect to (x) all or a portion of the aggregate Obligations (as such term is defined in the DIP Facility) then outstanding under the DIP Facility, (y) all or a portion of the aggregate Obligations (as such term is defined in the Prepetition Loan Agreement) then outstanding under the Prepetition Loan Agreement and (z) all or a portion of the aggregate principal amount then outstanding under the 13% Senior Secured Notes of Seller due 2012 (the *"Secured Notes"*), provided that any such credit bid of the Secured Notes shall be effected by the Indenture Trustee, in accordance with the Indenture, and be for the benefit of all holders of the Secured Notes; (ii) cash and (iii) any combination of (i)(x), (i)(y), (i)(z) and (ii).

## ARTICLE 3
## CLOSING AND DELIVERIES

3.1.    Closing.  The consummation of the transactions contemplated hereby (the *"Closing"*) shall take place at the offices of Akin Gump Strauss Hauer & Feld LLP, 590 Madison Avenue, New York, New York at 10:00 a.m. ET on the second Business Day following the satisfaction or waiver by the appropriate party of all the conditions contained in Article 11 hereof, or on such other date or at such other place and time as may be agreed to by the parties hereto (the *"Closing Date"*).  The Closing will be deemed to be effective at 11:59 p.m. (local time) on the Closing Date.

3.2.    Seller's Deliveries.

(a) The sale, transfer, assignment and delivery by Seller of the Acquired Assets to Buyer, as herein provided, shall be effected on the Closing Date.  At the Closing, Seller shall deliver the following documents which shall be consistent with the terms of this Agreement:

(i)    a bill of sale with respect to the Acquired Assets, duly executed by Seller and in the form of Exhibit A hereto;

(ii)    an assignment and assumption agreement with respect to the Assigned Contracts and Assumed Liabilities, duly executed by Seller and in the form of Exhibit B hereto;

(iii)    the Business Records (it being understood that any Business Records located at the Seller's corporate offices need not be physically delivered, but shall be deemed delivered at the Closing);

(iv) an assignment and conveyance agreement with regard to the Real Estate Leases, duly executed by Seller and in the form of <u>Exhibit C</u> hereto;

(v) a secretary's certificate certifying as to the resolutions of the board of directors of Seller approving and authorizing this Agreement and the transactions contemplated by this Agreement and in the form of <u>Exhibit D</u> hereto;

(vi) an affidavit of non-foreign status that complies with section 1445 of the Code, duly executed by Seller and in the form of <u>Exhibit E</u> hereto;

(vii) a certificate signed by a duly authorized officer of Seller in accordance with <u>Section 11.3(a)</u>;

(viii) a certificate signed by a duly authorized officer of Seller in accordance with <u>Section 11.3(b)</u>; and

(ix) such other documents as Buyer's counsel may reasonably request that are necessary to evidence or consummate the transactions contemplated by this Agreement.

(b) Notwithstanding anything in this Agreement or any Ancillary Agreement to the contrary, Seller's obligation to convey to Buyer all rights of Seller under the Permits listed on <u>Schedule 1.1(g)</u> shall consist of providing: (i) if required by Law, notices of intent to transfer the Permit to Buyer in accordance with the Government regulations governing such Permit transfer, (ii) information as required by the Government regulations governing such Permit transfer and (iii) assistance to Buyer in obtaining the transfer of such Permits.

3.3. <u>Buyer's Deliveries</u>. At the Closing, Buyer shall deliver the following documents which shall be consistent with the terms of this Agreement:

(a) Buyer shall (i) pay to Seller the cash portion of the Purchase Price, if any, by wire transfer of immediately available funds to an account designated by Seller; (ii) cause the Lenders to credit bid all or a portion of the aggregate principal the amount then outstanding under the DIP Facility; and/or (iii) cause the Indenture Trustee to credit bid all or a portion of the aggregate principal amount then outstanding under the Secured Notes;

(b) an assignment and assumption agreement with respect to the Assigned Contracts and Assumed Liabilities, duly executed by Buyer and in the form of <u>Exhibit B</u> hereto;

(c) an assignment and conveyance agreement with regard to the Real Estate Leases, duly executed by Buyer and in the form of <u>Exhibit C</u> hereto;

(d) a certificate signed by a duly authorized officer of Buyer in accordance with Section 11.2(a);

(e) a certificate signed by a duly authorized officer of Buyer in accordance with Section 11.2(b); and

(f) such other documents as Seller's counsel may reasonable request that are necessary to evidence or consummate the transactions contemplated by this Agreement.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer, as of the date hereof and as of the Closing Date, as follows:

4.1. Corporate Organization. Seller is duly organized and validly existing under the Laws of the State of Delaware. Subject to any necessary authority from the Bankruptcy Court, Seller has all requisite power and authority and all necessary approvals, permits, licenses and authorizations to own its properties and assets and to conduct its business as now conducted.

4.2. Authorization and Validity. Subject to the Bankruptcy Court's entry of the Sale Order and the receipt of the Consents set forth on Schedule 4.4 of the Disclosure Schedules, Seller has all requisite power and authority to enter into this Agreement and all other instruments and documents (the "*Transaction Documents*") required to be executed and delivered by Seller pursuant hereto or to enable Seller to effect the transactions contemplated hereby and, to carry out its obligations hereunder and thereunder. Subject to the entry of the Sale Order, the execution and delivery of this Agreement and the Transaction Documents and the performance by Seller of its obligations hereunder and thereunder have been duly authorized by all necessary action by the board of directors of Seller, and no other proceedings on the part of Seller are necessary to authorize such execution, delivery and performance. This Agreement and the Transaction Documents required to be executed and delivered by Seller have been duly executed by Seller and, subject to the Bankruptcy Court's entry of the Sale Order, constitute its valid and binding obligation, enforceable against it in accordance with the terms herein and therein.

4.3. No Conflict or Violation. Subject to (a) the receipt of all Consents set forth on Schedule 4.4 of the Disclosure Schedules, (b) the Bankruptcy Court's entry of the Sale Order and (c) the receipt of the Antitrust Approvals, if any, the execution, delivery and performance by Seller of this Agreement do not and will not (i) violate or conflict with any provision of the bylaws or certificate of incorporation (collectively, the "*Organizational Documents*") of Seller, (ii) violate any provision of law, regulation, rule or other legal requirement of any Government ("*Law*") or any order, judgment or decree of any court or Government ("*Order*") applicable to Seller, or (iii) violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under any Assigned Contract.

4.4. Consents and Approvals. Schedule 4.4 of the Disclosure Schedules sets forth a true and complete list of each Consent and each declaration to or filing or registration with any Government or other Person that is required in connection with the execution and delivery of this

Agreement and the Transaction Documents by Seller or the performance by Seller of its obligations hereunder or thereunder.

4.5.     Compliance with Law. Except as may result from the Bankruptcy Case, since December 31, 2005, (i) Seller has not received written notice of any violation of any Law; (ii) Seller is not in default with respect to any Order, applicable to any of the Acquired Assets; and (iii) no Action is pending or, to Seller's knowledge, threatened against Seller alleging any failure to comply with any Order or Law. No material expenditures are, or based on any Law, Order or Permit will be, required of Buyer for Seller and its business and operations to remain in compliance with all Laws, Orders and Permits immediately following the Closing.

4.6.     Litigation. As of the date of this Agreement and except as set forth on Schedules 4.6 or 4.9 of the Disclosure Schedules, there are no Claims, suits or proceedings pending or, to the Knowledge of Seller, threatened, before any Government brought by or against Seller. No Order or Action required to be set forth in Schedules 4.6 or 4.9 questions the validity or enforceability of this Agreement or any Transaction Document, or could result in any Material Adverse Effect on Seller or the Acquired Assets, and Seller has no basis to believe that any such Action may be brought or threatened against Seller.

4.7.     Material Contracts.

(a) Schedule 4.7 of the Disclosure Schedules sets forth a true, complete and correct list of each Contract to which Seller or any Affiliate thereof is a party or is bound under which the consequences of a default under or termination of such Contract would reasonably be expected to have a Material Adverse Effect (collectively, the "*Material Contracts*"). Seller has provided or made available to Buyer true and complete copies of each Material Contract (including all amendments thereto).

(b) Seller has performed any obligations required to be performed by it to date and is not in breach or default thereunder, and, to the Knowledge of the Company, no other party to any of the Material Contracts is (with or without the lapse of time or the giving of notice, or both) in material breach or default thereunder, except only for those defaults that will be cured in accordance with the Sale Order (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Assigned Contracts). Each of the Material Contracts is, or will be at the Closing, valid, binding and in full force and effect against Seller.

4.8.     Permits. Schedule 4.8 of the Disclosure Schedules sets forth a complete and correct list of all material Permits and all pending applications therefor obtained by Seller in connection with the Business or the Acquired Assets. As of the date of this Agreement, each such Permit is, and as of the Closing Date, each such Permit will be, valid and in full force and effect, and is not subject to any pending or, to Seller's Knowledge, threatened administrative or judicial proceeding to revoke, cancel, suspend or declare such Permit invalid in any respect.

4.9.     Environmental Matters. Seller is in compliance with applicable Environmental Laws applicable to the Acquired Assets and the Business.

(b) Since December 31, 2003, Seller has not received a written complaint, Order, directive, Claim, request for information, citation or notice of violation from any Government or any other Person relating to any actual or alleged noncompliance with or liability under any Environmental Law with respect to any release, spill, leak, discharge or emission of any Hazardous Materials to the air, surface water, groundwater or soil of the Real Property.

4.10. Real Property. Seller does not own any real property.

4.11. Employee Benefits. Set forth on Schedule 4.11 of the Disclosure Schedules is a list of all Employee Benefits Plans ("*Employee Benefits Plans*") which Seller maintains or to which Seller contributes for the Employee.

4.12. Insurance. Schedule 4.12 of the Disclosure Schedules sets forth a true, complete and correct description of all insurance policies maintained by Seller as of the date hereof. As of the date hereof, all such insurance policies are in full force and effect and all premiums that have become due and payable have been duly paid. No written notice of cancellation, non-renewal or termination has been received with respect to any such policy which has not replaced on substantially similar terms prior to the date of such cancellation. Seller maintains insurance in such amounts and covering such risks and liabilities as are commercially reasonable and appropriate for the operation of the Business.

4.13. Utilities. Seller has no Knowledge of and has not received any notice of the curtailment of any utility service supplied to the Real Property. All water and all electrical, telecommunication, sanitary and storm sewer and drainage lines, systems and hook ups located upon, under, at or adjacent to the Real Property necessary for the conduct of the Business as currently contemplated and as proposed to be conducted are installed and connected under valid permits.

4.14. Title to Assets. Seller has good, marketable and valid title to each and all of the Acquired Assets, in each case free and clear of all liens, claims or encumbrances, except for Permitted Liens.

4.15. Intellectual Property. Set forth on Schedule 1.1(f) of the Disclosure Schedules hereto is a complete and accurate list of the Intellectual Property. Seller has not licensed its rights in any Intellectual Property, current or planned products, designs or services to any other Person. Seller owns all right, title and interest in and to all the Intellectual Property free and clear of all liens, claims or encumbrances (except for Permitted Liens). Schedule 1.1(f) of the Disclosure Schedules hereto completely and accurately sets forth which of the Intellectual Property is duly, validly and properly registered with or issued by, as applicable, the U.S. Patent and Trademark Office, the Registrar of Copyrights and applicable foreign Government in foreign jurisdictions. All of such Intellectual Property registrations are valid and subsisting, all pending applications for such Intellectual Property are live and all maintenance, renewal and other fees relating to such registrations or applications are current, in each case, in all material respects. There are no material claims, demands or proceedings instituted or pending or, to the Knowledge of Seller, threatened by any Person contesting or challenging the right of Seller to use any Intellectual Property which, if adversely determined, would be materially adverse to the Business

or the Acquired Assets. To the Knowledge of Seller, there are no patents, trademarks, trade names, copyrights, or trade secrets owned by a Person other than Seller which Seller is using without license to do so. Seller owns or has the right to use all Intellectual Property necessary or desirable to operate the Business. Each item of Intellectual Property used by Seller in the operation of the Business immediately prior to the Closing will be owned or available for use by Buyer on identical terms and conditions immediately subsequent to the Closing. To the Knowledge of Seller, Seller has not interfered with, infringed upon, misappropriated, or otherwise come into conflict with any other Person's intellectual property. Seller has never received any notice alleging any interference, infringement, misappropriation, violation or conflict with another Person's intellectual property rights (including any claim that Seller must license or refrain from using any other Person's intellectual property). To the Knowledge of Seller, no other Person has interfered with, infringed upon, misappropriated, or otherwise come into conflict with the Intellectual Property. All former and current employees of the Seller have executed written contracts with Seller that assign to Seller all rights to any inventions, Improvements, discoveries, or information relating to the Business. To the Knowledge of Seller, no new products, inventions, procedures, or methods of manufacturing or processing have been developed by any competitors or other Persons which reasonably could be expected to supersede or make obsolete any actual or planned product or process used in the operation of the Business.

4.16.    Brokers.    Other than as set forth on Schedule 4.16 of the Disclosure Schedules, neither Seller nor any of its Affiliates has authorized any Person to act as broker, finder, banker, consultant, intermediary or in any other similar capacity which would entitle such Person to any investment banking, brokerage, finder's or similar fee in connection with the transactions contemplated by this Agreement, except where any fee or payment due such persons would be solely the obligation of Seller or its Affiliates.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows, as of the date hereof and as of the Closing Date:

5.1.    Corporate Organization.    Buyer is Delaware corporation, duly organized, validly existing and in good standing under the Laws of the State of Delaware, and has all requisite power and authority to own its properties and assets and to conduct its business as now conducted.

5.2.    Authorization and Validity.    Buyer has all requisite power and authority to enter into this Agreement and to execute and deliver the Transaction Documents to which it is a party and to carry out its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Transaction Documents and the performance of Buyer's obligations hereunder and thereunder have been duly authorized by all necessary action by the board of directors of Buyer, and no other proceedings on the part of Buyer are necessary to authorize such execution, delivery and performance. This Agreement and the Transaction Documents to which it is a party have been duly executed by Buyer and constitute its valid and binding obligation, enforceable against it in accordance with the terms herein and therein.

5.3.     No Conflict or Violation. The execution, delivery and performance by Buyer of this Agreement and the execution and delivery of the Transaction Documents to which Buyer is a party does not and will not violate or conflict with any provision of the organizational documents of Buyer and does not and will not violate any provision of Law, or any Order applicable to Buyer, nor will it result in a breach of or constitute (with due notice or lapse of time or both) a default under any Material Contract to which Buyer is a party or by which it is bound or to which any of its properties or assets is subject.

5.4.     Consents, Approvals and Notifications. The execution, delivery and performance of this Agreement and the Transaction Documents by Buyer does not require the Consent of, or filing with or notification of, any Government or any other Person except: (a) for entry of the Sale Order by the Bankruptcy Court or (b) for such Consents and filings, the failure to obtain or make would not reasonably be expected to have a Material Adverse Effect on the ability of Buyer to consummate the transactions contemplated hereby.

5.5.     Adequate Assurances Regarding Assigned Contracts. As of the Closing Date, Buyer will be capable of satisfying the conditions contained in sections 365(f)(2)(B) of the Bankruptcy Code with respect to the Assigned Contracts.

5.6.     Brokers. Other than as set forth on Schedule 4.16 of the Disclosure Schedules, neither Buyer nor any of its Affiliates has authorized any Person to act as broker, finder, banker, consultant, intermediary or in any other similar capacity which would entitle such Person to any investment banking, brokerage, finder's or similar fee in connection with the transactions contemplated by this Agreement, except where any fee or payment due such persons would be solely the obligation of Buyer or its Affiliates.

### ARTICLE 6
### COVENANTS OF SELLER

Seller hereby covenants to Buyer as follows:

6.1.     Actions Before Closing. Seller shall use reasonable best efforts to perform and satisfy all conditions to Buyer's obligations to consummate the transactions contemplated by this Agreement that are to be performed or satisfied by Seller under this Agreement.

6.2.     Maintenance of Assets Before the Closing Date.

(a) Except as contemplated by this Agreement or with the written consent of Buyer, prior to the Closing Date, Seller shall use reasonable best efforts to operate the Business in the ordinary course in a manner consistent with past practice, and shall confer on a regular and frequent basis with Buyer and its representatives to report on operational matters and the general status of ongoing operations. Notwithstanding the generality of the foregoing, Seller shall, between the date hereof and the Closing Date, use reasonable best efforts to (a) conduct the Business in compliance with all applicable Laws, (b) use reasonable best efforts to preserve the Business's relationships with the current customers, suppliers and others having business dealings with the Business, (c) maintain the Acquired Assets in their current working order, condition and repair as of the date

hereof, ordinary wear and tear excepted, (d) perform in all material respects the obligations required to be performed by Seller under the Contracts, other than to cure prepetition monetary defaults, (e) maintain the Business Records on a basis consistent with prior practice, (f) bill for products sold or services rendered and pay accounts payable in connection with the Business consistent with past practice, (g) maintain all insurance policies set forth on Schedule 4.12 hereto, or suitable replacements therefor, in full force and effect through the close of business on the Closing Date, (i) provide Buyer with updated monthly financial information concerning the Business, as reasonably requested by Buyer, and (j) grant Buyer reasonable access to its customers, distributors and suppliers and cooperate with Buyer in communicating with such Persons.

(b) Without limiting the generality of Section 6.2(a), prior to the Closing Seller shall not, and shall not permit its Affiliates to, without the prior written consent of Buyer: (i) sell, lease or transfer any of the Acquired Assets or parts thereof, (ii) amend, modify, terminate or change in any material respects any Assigned Contract, or (iii) grant a consensual Lien (other than a Permitted Lien) on the Acquired Assets.

(c) In the event Seller is directed by the Bankruptcy Court to convey or dispose of an asset that would be an Acquired Asset, Seller shall either provide the proceeds of such asset conveyance to Buyer or reduce the Purchase Price by the fair market value of such asset.

6.3.     Consents and Approvals. Seller shall use reasonable best efforts to obtain all Consents listed on Schedule 4.4 of the Disclosure Schedules.

6.4.     Access to Properties and Records; Confidentiality. To the extent permitted under Law and any relevant confidentiality agreements, Seller shall afford to Buyer, and to the accountants, counsel and representatives of Buyer, reasonable access during normal business hours throughout the period prior to the Closing Date (or the earlier termination of this Agreement pursuant to Article 12) to the Business Records. Upon reasonable prior notice, at Buyer's sole cost, expense and risk, Seller shall also afford Buyer reasonable access, during normal business hours, to all Acquired Assets throughout the period prior to the Closing Date. During the period from the date hereof to the Closing Date, all information provided to Buyer or its agents or representatives by or on behalf of Seller or their agents or representatives (whether pursuant to this Section 6.4 or otherwise) shall be governed by and subject to the Confidentiality Agreement, dated on or about March 28, 2006, between certain shareholders of the Buyer and Seller (the *"Confidentiality Agreement"*). If after the Closing Seller (or any Affiliate of Seller) shall receive any payment or revenue that belongs to Buyer pursuant to this Agreement, Seller shall promptly remit or caused to be remitted the same to Buyer, without set-off or deduction of any kind or nature.

6.5.     Rejection of Assigned Contracts. Seller shall not reject any Assigned Contracts pursuant to the Bankruptcy Case without the prior written consent of Buyer.

6.6.     Further Assurances. Upon the request and at the sole expense of Buyer at any time after the Closing Date, Seller shall execute and deliver such documents as Buyer or its counsel may reasonably request to effectuate the purposes of this Agreement.

6.7.     Notices.  Seller shall give prompt notice to Buyer of (i) the occurrence or nonoccurrence of any event the occurrence or nonoccurrence of which would be likely to cause any representation or warranty made by Seller contained in this Agreement to be untrue or inaccurate, and (ii) any failure of Seller to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder.

6.8.     Casualty Loss.  Notwithstanding any provision in this Agreement to the contrary, if, before the Closing, all or any portion of the Acquired Assets is (a) condemned or taken by eminent domain, or (b) a material portion is damaged or destroyed by fire or other casualty, Seller shall notify Buyer promptly in writing of such fact, and (i) in the case of condemnation or taking, Seller shall assign or pay, as the case may be, any proceeds thereof to Buyer at the Closing, and (ii) in the case of fire or other casualty, Seller shall either restore such damage or assign the insurance proceeds therefrom to Buyer at Closing.  Notwithstanding the foregoing, the provisions of this Section 6.8 shall not in any way modify Buyer's other rights under this Agreement, including any applicable right to terminate the Agreement if any condemnation, taking, damage or other destruction resulted in a Material Adverse Effect.

6.9.     Disclosure Schedules.  It is hereby understood and agreed that the Disclosure Schedules referenced in this Agreement were not provided as of the date hereof.  Seller covenants and agrees to provide such Disclosure Schedules to Buyer within seven days of the date hereof.

## ARTICLE 7
## COVENANTS OF BUYER

Buyer hereby covenants to Seller as follows:

7.1.     Actions Before Closing Date.  Buyer shall use commercially reasonable efforts to perform and satisfy all conditions to Seller's obligations to consummate the transactions contemplated by this Agreement that are to be performed or satisfied by Buyer under this Agreement.

7.2.     Consents, Approvals and Notifications.  Buyer shall use commercially reasonable efforts to obtain all consents and approvals of all Governments, and all other Persons, required to be obtained by Buyer and provide notifications to all Persons required to be notified by Buyer to effect the transactions contemplated by this Agreement.  Buyer shall promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Sale Order, including furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's employees and representatives available to testify before the Bankruptcy Court.

7.3.     Adequate Assurances Regarding Assigned Contracts.  With respect to each Assigned Contract, to the extent requested by the Bankruptcy Court, Seller or the counterparty to such Contract, Buyer shall provide the Bankruptcy Court, Seller or such counterparty, as the case may be, adequate assurance of the future performance of such Assigned Contract by Buyer.

7.4.     Cure of Defaults. Buyer shall, on or prior to the Closing, cure any and all defaults under the Assigned Contracts that are required to be cured under the Bankruptcy Code and set forth on Schedule 7.4, so that such Assigned Contracts may be assumed by Seller and assigned to Buyer in accordance with the provisions of section 365 of the Bankruptcy Code.

7.5.     Availability of Business Records. After the Closing Date, Buyer shall provide to Seller and Related Persons (after reasonable notice and during normal business hours and without charge to Seller) access to all Business Records for periods prior to the Closing and shall preserve such Business Records until the later of (a) six (6) years after the Closing Date or (b) the required retention period for all government contact information, records or documents. Such access shall include access to any information in electronic form to the extent reasonably available. Buyer acknowledges that Seller has the right to retain originals or copies of Business Records for periods prior to the Closing. Prior to destroying any Business Records for periods prior to the Closing, Buyer shall notify Seller thirty (30) days in advance of any such proposed destruction of its intent to destroy such Business Records, and Buyer will permit Seller to retain such Business Records. With respect to any litigation and claims that are Excluded Liabilities, Buyer shall render all reasonable assistance that Seller may request in defending such litigation or claim and shall make available to Seller's personnel most knowledgeable about the matter in question. If, after the Closing, Buyer (or any Affiliate or creditor of Buyer) shall receive any payment or revenue that belongs to Seller pursuant to this Agreement, Buyer shall promptly remit or cause to be remitted the same to Seller, without set-off or deduction of any kind or nature.

7.6.     Employee and Benefits Matters.

(a) *Intent to Employ.* Buyer shall notify Seller at least one (1) Business Day prior to the Auction which employees of Seller Buyer intends to employ or cause to be employed by any of its Affiliates (such employees hereinafter referred to as the "*Accepting Employees*"). The employment offer will be timed with the intention of making the Accepting Employee's first day of employment effective as of the Closing Date. Accepting Employees' employment with the Buyer or any of its Affiliates will be "at will" and nothing contained in this Agreement or any other communication shall constitute a contract of employment and Employee shall not be a third party beneficiary of this Agreement.

(b) *Benefit Claims.* From and after the Closing Date, claims of the Accepting Employees for accrued salary, accrued vacation and other compensation and benefits ("*Benefits*") that are incurred before the Closing Date shall be the sole responsibility of Buyer. With respect to each employee benefits plan of Buyer in which the Accepting Employees may be eligible to participate after the Closing, Buyer shall recognize all service of the Accepting Employees with Seller for all purposes (including without limitation purposes of eligibility to participate, vesting credit, entitlement for benefits, and benefit accrual), except to the extent such treatment would result in duplicative accrual of benefits for the same period of service.

7.7.　　　Notices.　Buyer shall provide Seller with prompt written notice of Buyer's knowledge of (i) any breach of any representation or warranty by Buyer or (ii) any other material failure by Buyer to comply with the obligations of this Agreement.

7.8.　　　Amendment to List of Contracts.　Notwithstanding anything herein to the contrary, at any time prior to the date that is three (3) days prior to the Closing Date, (a) Buyer shall be entitled in its sole discretion to remove any executory contracts or unexpired leases from the list of Assigned Contracts by providing written notice thereof to Seller and any contracts or unexpired leases so removed shall not constitute Acquired Assets or Assumed Liabilities at the Closing and (b) Buyer shall be entitled in its sole discretion to request Seller to add to the list of Assigned Contracts any executory contracts or unexpired leases of the Business by providing written notice thereof to Seller, and any contracts or unexpired leases so added shall constitute Acquired Assets; provided that Buyer shall not be entitled to add to the list of Assigned Contracts any executory contracts or unexpired leases of Seller that Seller has previously rejected by order of the Bankruptcy Court. Seller shall give written notice to Buyer prior to the submission of any motion in its Bankruptcy Case to reject any executory contracts or unexpired leases; provided, that in no event shall Seller seek to reject any executory contract or unexpired lease associated with the Business prior to the Closing Date and provided, further, that Seller shall not seek to reject any executory contract or unexpired lease which is an Assigned Contract.

## ARTICLE 8
## BANKRUPTCY PROCEDURES

8.1.　　　Bankruptcy Actions.　Seller shall use its reasonable best efforts to obtain the entry of the Bidding Procedures Order and the Sale Order on the Bankruptcy Court's docket. Seller shall, within one (1) Business Day after the execution of this Agreement, file this Agreement with the Bankruptcy Court as an exhibit to the motion of the Seller seeking entry of the Sale Order. Buyer covenants and agrees that it shall cooperate with Seller in connection with furnishing information or documents to Seller to satisfy the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code.

8.2.　　　Bidding Procedures.　The bidding procedures (the "**Bidding Procedures**") to be employed with respect to this Agreement shall be those reflected in the Bidding Procedures Order. Seller shall use reasonable best efforts to obtain entry by the Bankruptcy Court of an Order in the form of Exhibit F hereto (the "**Bidding Procedures Order**") and such Bidding Procedures Order shall be entered no later than May 28, 2008.

8.3.　　　Sale Order .　Seller shall use reasonable best efforts to obtain entry by the Bankruptcy Court of an order of the Bankruptcy Court (the "**Sale Order**") approving the transactions contemplated by this Agreement and such Sale Order shall be in form and substance satisfactory to Buyer granting, among other things, that (i) such sale shall be, pursuant to Sections 105, 363(b) and 363(f) of the Bankruptcy Code, free and clear of all Liens other than Permitted Liens and Assumed Liabilities; (ii) all agreements, contracts, and leasehold interests required to be assumed by Seller and assigned to Buyer are so assumed and assigned free and clear of all Liens and Excluded Liabilities other than Permitted Liens and Assumed Liabilities pursuant to Section 365 of the Bankruptcy Code; (iii) Buyer is deemed to have purchased the Acquired Assets in good faith pursuant to Section 363(m) of the Bankruptcy Code; and (iv)

Seller is authorized and directed to execute, upon request by Buyer, one or more assignments in form, substance, and number reasonably acceptable to Buyer, evidencing the conveyance of the Acquired Assets to Buyer.

8.4.    Consultation with Buyer.    To the extent practicable, Seller shall provide Buyer, at least three (3) days in advance of filing with the Bankruptcy Court, a draft of any motions, orders or other pleadings that Seller proposes to file with the Bankruptcy Court seeking approval of this Agreement, including the motion to approve the Sale Order.    To the extent practicable, Seller shall reasonably cooperate with Buyer, and consider in good faith the views of Buyer, with respect to all such filings.

## ARTICLE 9
## REGULATORY MATTERS

Buyer hereby covenants to Seller, and Seller hereby covenants to Buyer, as follows:

9.1.    Regulatory Filings.    Subject to the terms and conditions of this Agreement, each party shall use its reasonable best efforts to (a) take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable Laws to consummate the transactions contemplated by this Agreement; (b) if required, file a Notification and Report Form pursuant to the HSR Act with respect to the transactions contemplated hereby within five Business Days after the date hereof; (c) supply as promptly as practicable any additional information and documentary material that may be requested or required pursuant to any Antitrust Law, including the HSR Act and (d) if applicable, cause the expiration or termination of the applicable waiting periods under the HSR Act or any other Antitrust Law as soon as practicable.

9.2.    Cooperation; Confidentiality Agreement.    In connection with the efforts referenced in Section 9.1 to obtain all requisite approvals and authorizations for the transactions contemplated by this Agreement under the HSR Act, any other Antitrust Law, or any state law, if any, each of the parties shall use reasonable best efforts to (a) cooperate with each other in connection with any filing or submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private party; (b) keep the other parties informed in all material respects of any material communication received by such party from, or given by such party to, any Government and of any material communication received or given in connection with any proceeding by a private party, in each case regarding any of the transactions contemplated hereby and (c) permit the other party to review any material communication given to it by, and consult with each other in advance of any meeting or conference with any Government, including in connection with any proceeding by a private party.    The foregoing obligations in this Section 9.2 shall be subject to the Confidentiality Agreement and any attorney-client, work product or other privilege, and each of the parties hereto shall coordinate and cooperate fully with the other parties hereto in exchanging such information and providing such assistance as such other parties may reasonably request in connection with the foregoing and in seeking early termination of any applicable waiting periods under Antitrust Law.    The parties will not take any action that will have the effect of delaying, impairing or impeding the receipt of any required authorizations, consents, Orders or approvals.    *"Antitrust Law"* means the Sherman Act, as amended, the Clayton Act, as amended, the HSR Act, the Federal Trade

Commission Act, as amended, and all other Laws and Orders that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition. "*Antitrust Approval*" means any approval or consent of any Government required under any applicable Antitrust Law or the expiration or termination of any applicable waiting period under any applicable Antitrust Law.

9.3.     Objections or Other Challenges.  If any objections are asserted with respect to the transactions contemplated hereby under any Antitrust Law or if any suit is instituted by any Government or any private party challenging any of the transactions contemplated hereby as violative of any Antitrust Law or if the filing pursuant to Section 9.1 is reasonably likely to be rejected or conditioned by federal or a state Government, each of the parties shall use reasonable best efforts to resolve such objections or challenge as such Government or private party may have to such transactions, including to vacate, lift, reverse or overturn any Order, whether temporary, preliminary or permanent, so as to permit consummation of the transactions contemplated by this Agreement.

9.4.     Permit Transfers.  Seller shall provide commercially reasonable assistance to Buyer to assist Buyer in (i) obtaining or (ii) the transfer of Permits from Seller to Buyer. Any and all fees required by any Government or any Person to obtain or for the transfer of a Permit shall be the sole responsibility of Seller.

## ARTICLE 10
## TAXES

10.1.     Taxes Related to Purchase of Assets.     Seller shall use commercially reasonable efforts to obtain Bankruptcy Court approval that, in accordance with Section 1146 of the Bankruptcy Code, the making or delivery of any instrument of transfer under the transactions contemplated by this Agreement shall not be taxed under any Law imposing any transfer Tax, sales Tax, real estate Tax, stamp Tax or similar Tax (collectively, "*Transaction Taxes*").  If the Bankruptcy Court grants such approval, the instruments transferring the Acquired Assets to Buyer shall contain the following endorsement:

"Because this instrument has been authorized pursuant to Order of the United States Bankruptcy Court for [＿＿＿＿＿＿], relating to a plan of reorganization of the Grantor, it is exempt from transfer taxes, stamp taxes or similar taxes pursuant to 11 U.S.C. § 1146, and any officer receiving this instrument is hereby authorized and directed to permit the transfer contemplated by this instrument without the payment of any stamp tax, transfer tax or similar tax."

(b) In the event that any Transaction Taxes shall be payable in connection with the transactions contemplated by this Agreement, such Transaction Taxes shall be paid by Buyer.  In no event shall any party to this Agreement be responsible for the income taxes of any other party that arise as a consequence of the transactions consummated hereunder.

10.2.　Proration of Real and Personal Property Taxes. All real and personal property taxes and assessments on the Acquired Assets for any taxable period commencing prior to the day immediately preceding the Closing Date (the "*Adjustment Date*") and ending after the Adjustment Date (a "*Straddle Period*") shall be prorated between Buyer and Seller as of the close of business on the Adjustment Date based on the best information then available, with (a) Seller being liable for such Taxes attributable to any portion of a Straddle Period ending prior to the Adjustment Date and (b) Buyer being liable for such Taxes attributable to any portion of a Straddle Period beginning on or after the Adjustment Date. Information available after the Adjustment Date that alters the amount of Taxes due with respect to the Straddle Period will be taken into account and any change in the amount of such Taxes shall be prorated between Buyer and Seller as set forth in the next sentence. All such prorations shall be allocated so that items relating to the portion of a Straddle Period ending prior to the Adjustment Date shall be allocated to Seller based upon the number of days in the Straddle Period prior to the Adjustment Date and items related to the portion of a Straddle Period beginning on or after the Adjustment Date shall be allocated to Buyer based upon the number of days in the Straddle Period from and after the Adjustment Date; provided, however, that the parties shall allocate any real property Tax in accordance with Section 164(d) of the Code.. The amount of all such prorations that must be paid in order to convey the Acquired Assets to Buyer free and clear of all Liens other than Permitted Liens shall be calculated and paid on the Closing Date; all other prorations shall be calculated and paid as soon as practicable thereafter.

10.3.　Cooperation on Tax Matters. Seller and Buyer shall (and shall cause their respective Affiliates to) cooperate fully with each other and make available or cause to be made available to each other for consultation, inspection and copying (at such other party's expense) in a timely fashion such personnel, Tax data, relevant Tax Returns or portions thereof and filings, files, books, records, documents, financial, technical and operating data, computer records and other information as may be reasonably required (a) for the preparation by such other party of any Tax Returns or (b) in connection with any Tax audit or proceeding including one party (or an Affiliate thereof) to the extent such Tax audit or proceeding relates to or arises from the transactions contemplated by this Agreement.

10.4.　Retention of Tax Records. After the Closing Date and until the expiration of all statutes of limitation applicable to Seller's liabilities for Taxes, Buyer shall retain possession of all accounting, business, financial and Tax records and information that (a) relate to the Acquired Assets and are in existence on the Closing Date and (b) come into existence after the Closing Date but relate to the Acquired Assets before the Closing Date. In addition, from and after the Closing Date, Buyer shall provide to Seller and their Related Persons (after reasonable notice and during normal business hours) access to the books, records, documents and other information relating to the Acquired Assets as Seller may reasonably deem necessary to (i) properly prepare for, file, prove, answer, prosecute and defend any Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer or (ii) administer or complete any cases under chapter 11 of the Bankruptcy Code of or including Seller. Such access shall include reasonable access to any computerized information systems that contain data regarding the Acquired Assets.

10.5.　Allocation of Purchase Price and Purchase Price Allocation Forms. The Purchase Price, the Assumed Liabilities and other relevant items shall be allocated among the Acquired Assets in accordance with Section 1060 of the Code. Buyer shall prepare and deliver

to Seller an allocation schedule setting forth Buyer's determination of the allocation (the "*Allocation Schedule*") within 60 days after the date hereof, which Allocation Schedule shall be subject to the reasonable approval of Seller. The Allocation Schedule shall identify the transferor and transferee thereof, and shall be prepared in accordance with Treas. Reg. Section 1.1060-1 (or any comparable provision of state or local tax Law) or any successor provision. The parties agree that they will report the federal, state, local and other Tax consequences of the purchase and sale hereunder (including in filings on IRS Form 8594) in a manner consistent with such allocation and that they will not take any position inconsistent therewith in connection with any Tax Return, refund claim, litigation or otherwise, unless and to the extent required to do so pursuant to applicable law. Seller and Buyer shall cooperate in the filing of any forms (including Form 8594) with respect to such allocation. Notwithstanding any other provision of this Agreement, this Section 10.5 shall survive any termination or expiration of this Agreement.

10.6.    Unbilled Transactional Taxes. If a Tax assessment is levied upon any party by an authorized Tax jurisdiction for unbilled transactional Taxes that are the obligation of the other party under this Agreement, then the non-assessed party shall reimburse the assessed party for those Taxes including any interest and penalty.

### ARTICLE 11
### CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES

11.1.    Conditions Precedent to Performance by Seller and Buyer. The respective obligations of Seller and Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver (other than the condition contained in Section 11.1(b), the satisfaction of which cannot be waived), on or prior to the Closing Date, of the following conditions:

(a) Bankruptcy Matters.

(i)    The Bankruptcy Court shall have entered the Sale Order by July 14, 2008 and it shall not be the subject of a pending appeal and shall not have been stayed, vacated, modified or supplemented without the prior written consent of Buyer.

(ii)    The Bankruptcy Court shall have entered the Bidding Procedures Order by May 28, 2008 and it shall have become a Final Order.

(iii)    The Bankruptcy Court shall not have entered an order (i) appointing a trustee or an examiner with expanded powers, or (ii) dismissing Seller's chapter 11 case or converting Seller's chapter 11 case to a case under chapter 7 of the Bankruptcy Code.

(b) Antitrust and Regulatory Approvals. If applicable, the waiting periods for the transactions contemplated under this Agreement under the HSR Act, and any other Antitrust Law shall have expired or terminated and the Regulatory Approvals on Schedule 11.1(b) shall have been obtained and requisite notice has been provided by Buyer to relevant Government authorities.

(c) No Order. No order, statute, rule, regulation, executive order, injunction, stay, decree, directive, or restraining order shall have been enacted, entered, promulgated or enforced by any court of competent jurisdiction or Government that would (i) prevent the consummation of any of the transactions contemplated by this Agreement or (ii) cause any of the transactions contemplated by this Agreement to be rescinded following consummation, nor shall any such order, statute, rule, regulation, executive order, injunction, stay, decree, directive, or restraining order be in effect. No Action shall be pending before any Government or before any arbitral body wherein an unfavorable injunction, judgment, order, decree, ruling, directive or charge would (x) prevent consummation of any of the transactions contemplated by this Agreement or (y) cause any of the transactions contemplated by this Agreement to be rescinded following consummation.

11.2.    Conditions Precedent to Performance by Seller. The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of the following conditions, any one or more of which may be waived by Seller in its sole discretion:

(a) Representations and Warranties of Buyer.    All representations and warranties made by Buyer in Article 5 of this Agreement shall be true and correct in all material respects on and as of the Closing Date as if again made by Buyer on and as of such date (or, if made as of a specific date, at and as of such date) (except for such representations and warranties which are qualified by "material" or "Material Adverse Effect", which such representations and warranties shall be true and correct in all respects), and Seller shall have received a certificate dated as of the Closing Date from Buyer to that effect.

(b) Performance of the Obligations of Buyer. Buyer shall have performed in all material respects all obligations required under this Agreement to be performed by it on or before the Closing Date (except with respect to the obligation to pay the Purchase Price in accordance with the terms of this Agreement, which obligation shall be performed in all respects as required under this Agreement), and Seller shall have received a certificate dated as of the Closing Date and signed by the President or a Vice President of Buyer to that effect.

(c) Cure of Defaults. Buyer shall, on or prior to the Closing, have cured any and all defaults under the Assigned Contracts that are required to be cured under the Bankruptcy Code and have provided all assurances of future performance required to be provided by Buyer hereunder, so that the Assigned Contracts may be assumed by Seller and assigned to Buyer in accordance with the provisions of section 365 of the Bankruptcy Code.

(d) Buyer's Deliveries. Buyer shall have delivered, and Seller shall have received, all of the items set forth in Section 3.3 of this Agreement.

(e) Releases. Each shareholder of Buyer shall have executed, and shall have used commercially reasonable efforts to cause the Indenture Trustee on behalf of the

holders of the Secured Notes to execute, on the Closing Date, releases of any and all claims, debts, demands or obligations of any name or nature they, in any capacity, or their Affiliates, hold, may hold or allege to hold as of the Closing Date against each individual that, as of or at any time after the Petition Date, is an officer, director, principal, employee, agent, financial advisor, attorney, accountant, investment banker, consultant, representative or other professional employed or engaged by Seller, except for those individuals identified in or as otherwise provided in the Sale Order; provided, however, that no individual or entity shall be released from any act or omission that constitutes gross negligence, willful misconduct or fraud. Each such release shall be in a form that is reasonably satisfactory to the Seller.

11.3.    Conditions Precedent to the Performance by Buyer. The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of the following conditions, any one or more of which may be waived by Buyer in its sole discretion:

(a) Representations and Warranties of Seller. The representations and warranties made by Seller in Article 4 of this Agreement shall be true and correct in all material respects as of the Closing, in each case as though made at and as of such time (or, if made as of a specific date, at and as of such date), except to the extent such failures to be true and correct do not constitute a Material Adverse Effect (except for representations and warranties which are qualified by "material" or "Material Adverse Effect", which such representations and warranties shall be true and correct in all respects), and Buyer shall have received a certificate dated the Closing Date from Seller to that effect.

(b) Performance of the Obligations of Seller. Seller shall have performed in all respects all obligations required under this Agreement to be performed by it on or before the Closing Date and Buyer shall have received a certificate dated the Closing Date and signed by the President or a Vice President of Seller to that effect.

(c) Material Adverse Effect. No Material Adverse Effect shall have occurred since the Petition Date.

(d) Third Party Consents. Buyer shall have received evidence satisfactory to Buyer of receipt by Seller of the Consents of third parties required under the contracts, licenses, agreements, leases, Permits and other instruments of Seller and not rendered unenforceable by applicable bankruptcy law or pre-conditions to the consummation of the transactions contemplated hereby which Consents shall not provide for the acceleration of any liabilities or any other detriment to Buyer, Seller, the Business or any of the Assets, and shall be in form and substance reasonably satisfactory to Buyer.

(e) DIP Facility.

(i) No Event of Default (as defined in the DIP Facility) shall have occurred under the DIP Facility which gives (x) the lenders thereunder a right to terminate the DIP Facility and (y) as a result of which, the lenders

thereunder have accelerated the repayment obligations of Seller pursuant thereto.

(ii) The Bankruptcy Court shall have entered within thirty days of the Petition Date a Final Order, in form and substance acceptable to Buyer, in its sole discretion, approving the DIP Facility which shall, among other things, authorize the repayment of the Prepetition Credit Agreement Claims (as defined in the DIP Facility), and which shall have remained in full force and effect, shall not be the subject of a pending appeal and shall not have been stayed, vacated, modified or supplemented without the prior written consent of Buyer.

(f) Seller's Deliveries. Seller shall have delivered, and Buyer shall have received, all of the items set forth in Section 3.2 of this Agreement.

(g) Modification of Leases. Seller and TA shall have amended that certain Lease and Installation Agreement, dated August 20, 2004, by and between Seller and TA Operating Corporation in a manner satisfactory to Buyer in its sole discretion.

## ARTICLE 12
## TERMINATION AND EFFECT OF TERMINATION

12.1.    Right of Termination. Notwithstanding anything to the contrary contained herein, this Agreement may be terminated only as provided in this Article 12. In the case of any such termination, the terminating party shall give notice to the other party specifying the provision pursuant to which the Agreement is being terminated.

12.2.    Termination by Buyer or Seller.

(a) This Agreement may be terminated at any time before Closing:

(i)      by mutual written consent of Seller and Buyer;

(ii)     by Buyer, if a Sale Order has not been entered within sixty (60) days after the Petition Date;

(iii)    by Buyer, anytime after July 18, 2008 (the *"Termination Date"*), if any condition contained in Section 11.1 has not been satisfied or waived as of such time; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 12.2(a)(iii) if Buyer's failure to fulfill any of its obligations under this Agreement is the reason that the Closing has not occurred on or before said date;

(iv)     by Seller, on any date that is after the Termination Date, if any condition contained in Section 11.1 has not been satisfied or waived as of such time; provided, however, that Seller shall not have the right to terminate this Agreement under this Section 12.2(a)(iv) if Seller's failure to fulfill any of

their obligations under this Agreement is the reason that the Closing has not occurred on or before said date;

(v) by either Buyer or Seller, immediately upon an Order becoming final and non-appealable that declares this Agreement or the Transaction Documents invalid or unenforceable in any material respect or that prevents or materially delays the consummation of the transactions contemplated hereby or thereby (a *"Termination Order"*); provided, however, that neither Seller nor Buyer shall have the right to terminate this Agreement pursuant to this Section 12.2(a)(iii) if such party or any of its Affiliates has sought entry of, or has failed to use all commercially reasonable efforts to oppose entry of, such Termination Order;

(vi) by Buyer immediately upon delivery of written notice to Seller by holders of a majority in principal amount of the Secured Notes notifying the Seller of their preference that the Seller not proceed with the transactions contemplated under this Agreement and instead effect a chapter 11 plan of reorganization;

(vii) by Buyer if a material breach of any provision of this Agreement has been committed by Seller and such breach has not been either waived by Buyer or cured by Seller within ten (10) days of Seller's receipt of notice of such breach;

(viii) by Seller if a material breach of any provision of this Agreement has been committed by Buyer and such breach has not been either waived by Seller or cured by Buyer within ten (10) days of Buyer's receipt of notice of such breach;

(ix) by Buyer if Buyer is unable to exercise its rights to credit bid all or a portion of any of the DIP Facility, the Prepetition Loan Agreement or the Secured Notes pursuant to Section 2.1; or

(x) by Buyer if the Disclosure Schedules delivered by Seller pursuant to Section 6.9 are not reasonably satisfactory to Buyer.

(b) If this Agreement is terminated pursuant to Section 12.2(a), (i) this Agreement shall become null and void and have no effect (other than this Article 12, Article 13 and Article 14, which shall survive termination) and (ii) none of Seller, Buyer or any of their respective Related Persons shall have any liability or obligation arising under or in connection with this Agreement.

12.3.    Effect of Failure of Seller's Conditions to Closing.

Seller may terminate this Agreement at any time after the Termination Date and before Closing if any condition contained in Section 11.2(a) has not been satisfied or waived by Seller as of such time; provided, however, that Seller shall not have the right to terminate this Agreement under this Section 12.3 if Seller's failure to fulfill any of its obligations under this

Agreement has been the reason that the Closing has not been consummated on or before such date. If this Agreement is terminated pursuant to this Section 12.3 (i) this Agreement shall become null and void and have no effect (other than this Article 12, Article 13 and Article 14, which shall survive termination) and (ii) except as provided in this Section 12.3 and 12.5, none of Seller, Buyer or any of their respective Related Persons shall have any liability or obligation arising under or in connection with this Agreement.

12.4.    Effect of Failure of Buyer's Conditions to Closing.Buyer may terminate this Agreement at any time after the Termination Date and before Closing if any condition contained in Section 11.3 has not been satisfied or waived as of such time; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 12.4 if Buyer's failure to fulfill any of its obligations under this Agreement has been the reason that the Closing has not been consummated on or before said date. If this Agreement is terminated pursuant to this Section 12.4: (i) this Agreement shall become null and void and have no effect (other than this Article 12, Article 13 and Article 14, which shall survive termination) and (iii) except as provided in this Section 12.4 and 12.5, none of Seller, Buyer or any of their respective Related Persons shall have any liability or obligation arising under or in connection with this Agreement.

12.5.    Termination on Alternative Transaction

(a) This Agreement may be terminated at any time immediately following the Auction by either Buyer or Seller upon Seller's entering into any Alternative Transaction.If this Agreement is terminated pursuant to Section 12.5(a): (i) Seller shall pay Buyer the Expense Reimbursement in accordance with Section 12.5(c), (ii) this Agreement shall become null and void and of no effect (except for this Article 12, Article 13 and Article 14, which shall survive termination), and (iv) except as provided in this Section 12.5(b) and 12.5(c), none of Buyer, Seller or their respective Related Persons shall have any liability or obligation arising under or in connection with this Agreement.

(c) Expense Reimbursement:

(i)    If this Agreement is terminated pursuant to Section 12.5(a) Seller shall pay to Buyer from the proceeds of the Alternative Transaction, subject to the provisions and conditions set forth in the Bidding Procedures Order, reimbursement for Buyer's and its Affiliates' reasonable out-of-pocket costs and expenses (including legal, accounting, and other consultant fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby (the *"Expense Reimbursement"*), such fees to be paid upon the consummation of the Alternative Transaction.

(ii)    Seller's obligation to pay the Expense Reimbursement pursuant to this Section 12.5(c) shall survive termination of this Agreement and shall constitute an allowed administrative expense of Seller under section 503(b) and 507(a)(2) of the Bankruptcy Code without further Order of the Bankruptcy Court.

(iii)    The Expense Reimbursement, payable under the circumstances provided in Section 12.5(c)(i) shall be the exclusive remedy of Buyer and its Affiliates for any termination of this Agreement pursuant to Section 12.5. In no event shall Seller or any of its respective Affiliates or Related Persons have any liability with respect to Buyer or any other Person hereunder in excess of the applicable Expense Reimbursement in the event that this Agreement terminates for any reason permitted by Section 12.5, and any claim, right or cause of action by Buyer or any other Person against Seller or their respective Affiliates or Related Persons in excess of the applicable Expense Reimbursement is hereby fully waived, released and forever discharged. In no event shall Seller or their respective Affiliates have any liability to Buyer or any other Person for any special, consequential or punitive damages, and any such claim, right or cause of action for any damages that are special, consequential or punitive or for specific performance of this Agreement is hereby fully waived, released and forever discharged.

## ARTICLE 13
## MISCELLANEOUS

13.1.    Successors and Assigns.   Except as otherwise provided in this Agreement, no party hereto shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other party hereto, and any such attempted assignment without such prior written consent shall be void and of no force and effect.   This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties hereto.

13.2.    Governing Law; Jurisdiction.   This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of New York (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code.   For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.   After Seller is no longer subject to the jurisdiction of the Bankruptcy Court, any legal action or proceeding with respect to this Agreement or the transactions contemplated hereby may be brought in the courts of the State of New York sitting in Manhattan or of the United States for the Southern District of New York, and by execution and delivery of this Agreement, each of the Parties consents to the non-exclusive jurisdiction of those courts.   Each of the Parties irrevocably waives any objection, including any objection to the laying of venue or based on the grounds of *forum non conveniens*, which it may now or hereafter have to the bringing of any action or proceeding in such jurisdiction in respect of this Agreement or the transactions contemplated hereby.

13.3.    Disclosure Schedule Supplements.   From time to time prior to the Closing, Seller shall supplement or amend the Disclosure Schedules to this Agreement with respect to any matter that, if existing, occurring or known at the date of this Agreement, would have been required to be set forth or described in the Disclosure Schedules. The Disclosure Schedules shall be deemed amended by all such supplements and amendments for all purposes (except for purposes of determining whether the conditions set forth in Section 11.3(a) of the Agreement

have been satisfied), unless within ten (10) days from the receipt of such supplement or amendment Buyer provides notice in good faith that the facts described in such supplement or amendment will have a Material Adverse Effect on the Acquired Assets.

### 13.4. Survival of Representations and Warranties

None of the representations or warranties of Seller set forth in this Agreement or in any certificate delivered pursuant to Section 11.3(a) or Section 11.3(b) shall survive the Closing.

### 13.5. No Recourse Against Third Parties

Buyer agrees for itself and for all of its officers, directors, shareholders, Affiliates, attorneys, agents and any other parties making any claim by, through or under the rights of such persons (collectively, the *"Buyer Group"*) that no member of Buyer Group shall have any rights against any officer, director, shareholder, Affiliate, attorney or agent of Seller (each, individually, a *"Non-Recourse Person"*) for any Losses that any member of Buyer Group may suffer in connection with this Agreement. Buyer and all members of Buyer Group hereby waive any rights, recourse or remedy against Seller under any Environmental Laws, including any arising under the Comprehensive Environmental Response, Compensation and Liability Act, any analogous state law, or the common law, with respect to any environmental health or safety matter relating to the Acquired Assets. If any member of Buyer Group makes a claim against any person or entity that is not a Non-Recourse Person (a *"Third Person"*) that in any way gives rise to a claim by such Third Person against any Non-Recourse Person asserting that such Non-Recourse Person is or may be liable to such Third Person with respect to any Losses arising in connection with this Agreement (whether by way of indemnification, contribution, or otherwise on any theory whatever) (a *"Claim Over"*), such member of Buyer Group shall reduce or credit against any judgment or settlement such member of Buyer Group may obtain against such Third Person the full amount of any judgment or settlement such Third Person may obtain against the Non-Recourse Person on such Claim Over, and shall, as part of any settlement with such Third Person, obtain from such Third Person for the benefit of such Non-Recourse Person a satisfaction in full of such Third Person's Claim Over against the Non-Recourse Person.

13.6.    Mutual Drafting. This Agreement is the result of the joint efforts of Buyer and Seller, and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the parties and there is to be no construction against either party based on any presumption of that party's involvement in the drafting thereof.

13.7.    Severability. In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of the date this Agreement was executed or last amended.

13.8.    Notices. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given:  (a) on the date of

service if served personally on the party to whom notice is to be given; (b) on the day of transmission if sent via facsimile transmission to the facsimile number given below, and telephonic confirmation of receipt is obtained promptly after completion of transmission; (c) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service or (d) on the fifth day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to Seller:

IdleAire Technologies Corporation
410 N. Cedar Bluff Road, Suite 200
Knoxville, TN 37923
Attention: James Price
Facsimile: (865) 437-2620

Copy to:

Holland & Knight LLP
10 St. James Avenue, 11th Avenue
Boston, MA 02116
Attention: John J. Monaghan
Facsimile: (617) 523-6850

If to Buyer:
c/o Whitebox Advisors LLC
3033 Excelsior Boulevard, Suite 300
Minneapolis, MN 55416
Attention: Mark Strefling
Facsimile: (612) 253-6100

Copy to:

Akin Gump Strauss Hauer & Feld LLP
590 Madison Avenue
New York, New York 10022
Attention: Michael S. Stamer
            Stephen Kuhn
Facsimile: (212) 872-1002

Any party may change its address for the purpose of this Section 13.8 by giving the other party written notice of its new address in the manner set forth above.

13.9.    Amendments; Waivers. This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived,

only by a written instrument executed by the parties hereto, or in the case of a waiver, by the party waiving compliance. Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be nor construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

13.10. <u>Public Announcements</u>. No party shall make any press release or public announcement concerning the transactions contemplated by this Agreement without the prior written approval of the other parties, unless a press release or public announcement is required by Law or Order of the Bankruptcy Court. If any such announcement or other disclosure is required by Law or Order of the Bankruptcy Court, the disclosing party shall give the nondisclosing party or parties prior notice of, and an opportunity to comment on, the proposed disclosure. The parties acknowledge that Seller shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order and Bidding Procedures Order.

13.11. <u>Entire Agreement</u>. This Agreement, the Transaction Documents and the Confidentiality Agreement contain the entire understanding among the parties hereto with respect to the transactions contemplated hereby and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions. All Schedules hereto and any documents and instruments delivered pursuant to any provision hereof are expressly made a part of this Agreement as fully as though completely set forth herein.

13.12. <u>Parties in Interest</u>. Nothing in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any Persons other than Seller and Buyer and their respective successors and permitted assigns. Nothing in this Agreement is intended to relieve or discharge the obligations or liability of any third Persons to Seller or Buyer. No provision of this Agreement shall give any third Persons any right of subrogation or action over or against Seller or Buyer.

13.13. <u>Headings</u>. The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

13.14. <u>Construction</u>. Unless the context of this Agreement otherwise requires, (i) words of any gender include the other gender, (ii) words using the singular or plural number also include the plural or singular number, respectively, (iii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement as a whole and not to any other particular article, section or other subdivision, (iv) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," (v) "shall," "will," or "agrees" are mandatory, and "may" is permissive, and (vi) "or" is not exclusive.

13.15. <u>Currency</u>. Except where otherwise expressly provided, all amounts in this Agreement are stated and shall be paid in United States currency.

13.16. <u>Time of Essence</u>. Time is of the essence of this Agreement.